## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM L. SCHOEN, MARY J. NESBIT, ROBIN L. ROSEWICZ, GEORGE E. POOLE, AND JAMES E. SWARTZ, JR., individually and as representatives of a class of participants and beneficiaries of the Allegheny Technologies Incorporated Pension Plan;<br><br>    *Plaintiffs*,<br><br>v.<br><br>ATI INC., THE ALLEGHENY TECHNOLOGIES INCORPORATED PLAN ADMINISTRATIVE COMMITTEE, STATE STREET GLOBAL ADVISORS TRUST CO., AND JOHN DOES 1–5;<br><br>    *Defendants*. | Civil Action No.<br><br>**COMPLAINT—CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

1.    Plaintiffs William L. Schoen, Mary J. Nesbit, Robin L. Rosewicz, George E. Poole, and James E. Swartz, Jr., individually and as representatives of a class of similarly situated participants and beneficiaries whose benefit payments were transferred unlawfully from the Allegheny Technologies Incorporated Pension Plan (the "Plan") bring this action against Defendants ATI, Inc. ("ATI"), The Allegheny Technologies Incorporated Plan Administrative Committee (the "Committee" and, together with ATI, the "ATI Defendants"), State Street Global Advisors Trust Company ("State Street"), and John Does 1–5 (collectively, "Defendants"), for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. §§ 1001 *et seq.*

2.    Congress enacted ERISA and designed the statute to impose strict fiduciary duties and other conduct-regulating obligations upon plan sponsors, administrators, and others, such as to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers. Plan fiduciaries must act "within the statutory parameters of prudence

and loyalty," which "impose a fiduciary standard that is considered the 'highest known to the law.'" *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982)), *cert. denied*, 140 S. Ct. 2565 (2020). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). That is, fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing Restatement (Second) of Trusts § 170 (1959); Austin Wakeman Scott, *II Scott on Trusts* §170, at 1297–99 (3d ed. 1967); George G. Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1978)).

3.      On or about October 17, 2023, the ATI Defendants transferred approximately $1.5 billion of ATI's pension obligations to either Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively, "Athene"), a highly risky private equity-controlled insurance company with a complex and opaque structure. This transaction affected approximately 8,200 ATI retirees and their beneficiaries, including Plaintiffs, who depended on ATI's promise to guarantee their pension benefits throughout retirement under an ERISA-governed Plan. By offloading ATI's pension obligations to Athene, Defendants caused Plaintiffs and similarly situated ATI retirees and their beneficiaries to lose their status as "participants" in the ERISA-governed Plan, and therefore, Plaintiffs are no longer entitled to ERISA's protections for employee retirement benefits. Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, since its 1994 amendment, the Department of Labor has consistently stated that ERISA requires a fiduciary to obtain the "safest annuity available" and that ERISA requires an independent fiduciary to recommend the annuity provider with "the highest claims-paying ability willing to write the business." 29 C.F.R. § 2509.95-1.

4.    Defendants did not select the safest possible annuity available to ensure the continued, long-term financial security of ATI retirees and their beneficiaries. Instead, Defendants selected Athene, whose annuity products are substantially riskier than those of numerous other traditional annuity providers. Annuities issued by Athene are structured to generate higher expected returns by investing in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations. This strategy creates significant risk at a great cost to retirees. Because the market devalues annuities when accounting for such risk, it is likely that ATI saved a substantial amount of money by selecting a group annuity contract (or group annuity contracts) ("GAC") from Athene over the actual safest annuity available. In transferring Plaintiffs' pension benefits to Athene, Defendants put ATI retirees' and their beneficiaries' future retirement benefits at substantial risk of default without appropriate compensation.

5.    To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transaction and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), (a)(3), (a)(9).

## JURISDICTION AND VENUE

6.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.    **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension

3

benefits and future retirement payments removed from an ERISA-governed pension plan backed by an established, multi-billion-dollar corporation and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.      **Venue.** This cause is properly lain in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because at least one of the alleged acts or omissions giving rise to liability occurred or failed to occur within this District, and at least one Defendant resides, may be found, or regularly transacts business in person in this District.

## PARTIES

### I.  The Allegheny Technologies Incorporated Pension Plan

9.      The Allegheny Technologies Incorporated Pension Plan (the "Plan") was effective on or about January 1, 1950.

10.     The Plan is, and at all relevant times was, a defined benefit, employee benefit pension plan pursuant to 29 U.S.C. § 1002(2)(A), (35) covering certain eligible employees of ATI and participating affiliated companies. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

4

11.     As of December 31, 2022, before the unlawful transaction at issue, the Plan covered approximately 11,990 total participants and beneficiaries and held approximately $1.7 billion in assets.

**II. Plaintiffs**

12.     William L. Schoen resides in Pittsburgh, Pennsylvania and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Schoen began his employment with ATI in 1968. Over the next 37 years, Mr. Schoen worked in ATI's Finishing Department, retiring from his position as Operator of the Blast & Pickle Line in 2005. Mr. Schoen began receiving pension payments from ATI in 2005. Mr. Schoen began receiving third-party annuity payments from Athene in 2024.

13.     Mary J. Nesbit resides in Freeport, Pennsylvania and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Nesbit began her employment with ATI in 1976. Over the next 36 years, Ms. Nesbit worked in ATI's Safety Department, retiring from her Safety Coordinator position in 2012. Ms. Nesbit began receiving pension payments from ATI in 2012. Ms. Nesbit began receiving third-party annuity payments from Athene in 2024.

14.     Robin L. Rosewicz resides in Lower Burrell, Pennsylvania and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Rosewicz began his employment with ATI in 1977. Over the next 35 years, Mr. Rosewicz worked in Department No. 3, retiring from his position as a Steelworker in 2012. Mr. Rosewicz began receiving pension payments from ATI in 2012. Mr. Rosewicz began receiving third-party annuity payments from Athene in 2024.

15.     George E. Poole resides in Arnold, Pennsylvania and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Poole began his employment with ATI in 2000. Over the next 23 years, Mr. Poole worked in Department No. 8-3, retiring from his Laborer position

in 2023. Mr. Poole began receiving pension payments from ATI in or around August 2023. Mr. Poole began receiving third-party annuity payments from Athene in 2024.

16. James E. Swartz, Jr. resides in Freeport, Pennsylvania and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Swartz began his employment with ATI in 1976. Over the next 37 years, Mr. Swartz worked as a Contract Coordinator before retiring in 2013. Mr. Swartz began receiving pension payments from ATI in 2013. Mr. Swartz began receiving third-party annuity payments from Athene in 2024.

### III. Defendants

17. ATI, Inc., formerly known as Allegheny Technologies, Inc. (NYSE: ATI) ("ATI") is a publicly traded, multinational Delaware corporation and a producer of specialty materials. ATI is headquartered in Dallas, Texas. ATI's core markets of aerospace and defense represent nearly 60% of its total sales. As of December 31, 2023, ATI employed approximately 7,300 "active employees" in 16 countries worldwide, including the United States. As of that same date, ATI recorded $4.17 billion in annual net revenue. As alleged herein, ATI is the Plan sponsor under 29 U.S.C. § 1002(16)(B). On information and belief, ATI entered into a commitment agreement with Athene under which the ATI Defendants agreed to purchase GACs that would transfer certain of ATI's defined benefit pension obligations to Athene. As alleged herein, ATI exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18. The Allegheny Technologies Incorporated Plan Administrative Committee (the "Committee") acted as the Plan Administrator under 29 U.S.C. § 1102(a) and had fiduciary

responsibility for the Plan. On information and belief, the Committee had the authority to manage and control the assets of the Plan. Accordingly, as alleged herein, the Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.    State Street Global Advisors Trust Co. ("State Street") is a trust company headquartered in Boston, Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. As a wholly owned subsidiary, it was formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. In connection with the transaction at issue, ATI hired State Street to serve as an independent fiduciary to the Plan, which required, among other things, for State Street to select an annuity provider in compliance with 29 C.F.R. § 2509.95-1. On information and belief, ATI and State Street entered into a commitment agreement with Athene for the transaction at issue, in breach of fiduciary duties owed to Plaintiffs. As alleged herein, State Street exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii). At all relevant times, State Street's website represented to the public that its services include "[i]nsurance provider selection for annuitizing defined benefit plans (in accordance with the Department of Labor's Interpretive Bulletin 95-1)[.]"

20.    John Does 1–5 are unknown members of the Committee that exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.    Each Defendant is a fiduciary within the meaning of ERISA because each of them was involved in selecting an annuity provider, which is an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. §§ 1002(21)(A); 1102(a).

**ERISA'S FIDUCIARY STANDARDS WHEN SELECTING ANNUITY PROVIDERS**

22.    ERISA's primary purpose, evidenced expressly by the plain meaning of its textual provisions, is to protect the retirement security of American workers and their beneficiaries, achieving its remedial purposes by, among other things, imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably, the fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). The statute provides, in pertinent part and with emphases added, that:

> [A] fiduciary shall discharge his duties with respect to a plan ***solely*** in the interest of the participants and beneficiaries and –
>
> > (A) for the ***exclusive*** purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

23.     The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1 ("IB 95-1"), setting forth its interpretation of the process a fiduciary is required to undertake in connection with transferring defined benefit pension plan obligations to an annuity provider pursuant to 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9). *See* 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

24.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000) (citing 29 U.S.C. §§ 1002(14)); *see also* 29 U.S.C. § 1106(a)–(b).

## FACTS APPLICABLE TO ALL COUNTS

### I.     Pension Risk Transfers ("PRT")

25.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were the Nation's predominant retirement system when ERISA was enacted in 1974.

26.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically in the form of a monthly income payment after retirement. Employers are

generally responsible for funding the pension plan to pay their benefit obligations to retirees. A formula that accounts for salary and years of service, among other factors, determines the amount of retirement benefits provided to employees.

27.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a defined benefit pension plan, the employer (or plan sponsor) bears that risk. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the employee bears the risk of underperformance. The employer must also make additional contributions to a defined benefit plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances including, among other things, if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants.

28.     In recent years, employers have increasingly sought to reduce their pension funding risk through pension risk transfer ("PRT") transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

29.     A plan sponsor's process in selecting an annuity provider to which it transfers an employer's pension obligations is a critically important fiduciary function. A plan sponsor's selection of an annuity provider has an irrevocable impact on retirees and their beneficiaries for the rest of their lives. As NISA Investment Advisors, LLC ("NISA") noted: it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."

30.    PRT transactions can take one of three forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the Plan by an insurer. As discussed below, the ATI PRT transaction at issue involved a partial buyout.

## II.    The risks associated with PRT transactions.

### A.    Lack of ERISA and PBGC Protections

31.    Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are covered by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

32.    SGAs are not pre-funded like the PBGC and thus offer substantially less protection compared to the PBGC. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. What is more, in certain states (including in California), such an annuitant automatically loses 20%, as some SGAs guarantee a maximum of 80% of the present value of the annuity, up to $250,000.

B.    **Risk of Insolvency and Executive Life**

33.    The risk of insurance company failure is not merely hypothetical. The 1991 collapse of Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially catastrophic consequences of high-risk insurance practices. Like the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

34.    As of 1982, Executive Life was one of the Nation's largest insurers and, by 1991, it had attracted over 300,000 policyholders with its A+ credit rating for financial soundness. But, in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown" before its 1991 seizure by the California Insurance Commissioner. Following the seizure, the California Insurance Commissioner sold Executive Life's portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for approximately half its value. Apollo is the parent company of Athene. Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion in 1991 (equivalent to approximately $9.1 billion in 2024).

35.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corporation (*i.e.*, the parent company of Executive Life of California and Executive Life of New York) was Drexel's largest buyer of junk bonds. Unlike most insurance companies that invested in safer assets, such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts to policyholders in the short-term, but its capacity was short-lived.

36.    By 1990, many of the Executive Life assets used to fulfill annuity payment obligations were in distress and trading significantly less than their purchase price. When questioned about the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, touting an A+ rating from AM Best and an AAA rating from Standard & Poor's.

37.    On April 11, 1991, California Insurance Commissioner John Garamendi seized Executive Life of California because its financial condition was a threat to policyholders. Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning that it was still considered "very good" despite a decline in position pending review. Less than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it took only weeks for parent company First Executive to file for bankruptcy protection. Executive Life and ratings agencies obscured the true riskiness of its bond portfolio, and hundreds of thousands of pensioners lost the vested financial security in retirement that their former employers had promised them in exchange for years of dedicated service.

38.    Executive Life was ultimately declared insolvent in 2012. In August 2013, the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. Many annuitants lost 50% or more of their annuity payments. The Executive Life Restructuring Agreement provides that GABC is expected to make reduced annuity payments to Executive Life annuitants for another 50 years.[1]

---

[1] *See* Agreement of Restructuring in Connection with the Liquidation of Executive Life Insurance Company of New York (Apr. 23, 2023), and Schedule 1.15 (List of Contracts).

### C.    Response to Executive Life and Interpretive Bulletin 95-1

39.    In response to Executive Life's collapse and its impact on hundreds of thousands of American retirees, and in order to prevent similar crises in the future, Congress passed the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401, 108 Stat. 4172 (Oct. 22, 1994) (codified as amended 29 U.S.C. §§ 1132(a)(7), 1132(a)(8), 1132(a)(9), 1132(*l*)(3)(B)), as an amendment to ERISA. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's "purchase of an insurance contract or insurance annuity" have a private right of action for appropriate relief including, but not limited to, "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

40.    On March 6, 1995, the Department of Labor promulgated IB 95-1, which establishes a framework for ERISA compliance when choosing an annuity provider in a PRT transaction. The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." Fiduciaries must "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities."

41.    To determine the safest available annuity, IB 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through SGAs. The fiduciaries must "obtain

the advice of a qualified, independent expert" if they do not possess the necessary expertise to evaluate these factors properly.

### D.    Private Equity Firms

42.    Since Executive Life's collapse, the PRT market has been dominated by traditional annuity providers, including New York Life Insurance Company ("New York Life"). But more recently, private equity firms have assumed a growing role in the PRT landscape both through purchasing life insurers and through serving as their third-party asset managers.

43.    The mission of private equity does not align with the interests of annuitants. While they began by purchasing insurance companies to finance operations, today they have moved beyond this business into the lines of private credit and insurance. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, they can also generate enormous investment management fees. They focus on maximizing their immediate financial returns instead of insuring the guaranteed pension benefits of their annuity beneficiaries.

44.    The United States Department of the Treasury expressed concerns of the potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of IB 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans. During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

45.    As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in

2015. Lawmakers and industry experts are also concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."

46.    The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the insurers' portfolio, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yield investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem attractive.

**III.    Athene and its financial risks.**

47.    Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

48.    On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-

backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo.

### A. Athene's complex investment structures and ratings.

49.     Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which are headquartered in Hamilton, Bermuda. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero.

50.     For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to the Federal Reserve Board economists, insurance companies, like Athene, hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers. Athene has a higher-than-average investment in collateral loan obligations (CLOs), and as of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher ratio than most other U.S. life industry participants.

51.     Thomas Gober, MBA, CFE, is a forensic accountant, Certified Fraud Examiner, and Insurance Examiner who has spent 37 years working both for and with government entities, including Mississippi state regulators, the Department of Justice, the U.S. Attorney's Office, and the Federal Bureau of Investigation. Mr. Gober conducts extensive studies of PRT transactions, examining life insurers' regulatory filings and looking for evidence of liabilities backed by high-

quality assets. According to Gober, affiliated transactions, such as those between Athene and Athene Life Re, are some of the biggest issues facing the PRT space.

52.    Annuity and life insurance companies maintain surpluses to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, acts as the only barrier between solvency and insolvency. To ascertain whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities. In the wake of the recent surge in life insurer liabilities and annuity sales spurred by PRT transactions, some life insurers backed by private equity report extremely small surpluses relative to the risk profile of their assets in their portfolios.

53.    As of year-end 2023, Athene's surplus stood at only 1.44%. In contrast, a traditional insurer, such as New York Life, maintained a surplus-to-liability ratio of 12.24%. The national average is over 7%. Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers and, as such, annuitants whose pensions have been transferred to Athene are at a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

54.    Athene touts an ample surplus, but this is misleading. When Athene discusses its surplus, it refers only to that of Athene Holding Ltd., the holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which as discussed *supra*, is among the thinnest in the country. Athene's total liabilities have also increased by more than 250% from 2018 to 2023. However, the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider.

55.     Athene also has a high concentration of risky assets relative to its surplus. For 2022, Athene reported $21 billion in "other loan-backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, which was significantly less than its $23.88 billion surplus.

56.     Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

57.     Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset manager (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt.

58.     Bermudian reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("U.S. SAP"). Bermuda does not follow the same detailed reporting standards. Under U.S. SAP, insurers are required to file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda,

Athene's affiliated reinsurers report only aggregate data without individual purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP.

59.    While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Instead of reinsuring through a third-party reinsurer to diversify risk, Athene "cedes" reinsurance to captive affiliates. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus.

60.    Beyond traditional reinsurance, Athene engages in significant Modified Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital requirements associated with its asset risks to a reinsurer while retaining the assets. In 2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9 billion in surplus. In contrast, other insurers, such as New York Life and TIAA, reported no ModCo with offshore affiliates in 2022 and 2023.

61.    Conducting ModCo transactions with Bermuda-based captive reinsurers, like Athene, simply involves swapping insurance risks among commonly controlled companies for the purpose of avoiding U.S. SAP requirements and artificially inflating Risk-Based Capital ("RBC") ratios. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. RBC ratios are inflated because ModCo arrangements allow Athene to remove risky assets from its RBC ratio. And the use of higher-risk assets enables Athene to value its liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through an ultimately circular ModCo transaction, Athene

obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus.

62.    The interdependence among Athene and its in-house, Bermuda-based reinsurers reporting under Bermudian standards exposes each of these entities to a heightened risk of failure. Should Athene's separate account and then general account be found insufficient to cover its liabilities, Athene would be forced to seek payment from its affiliated reinsurer for a portion of the annuity liabilities. These closely correlated events are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurers, which is itself. Furthermore, an inability to satisfy Athene's general account obligations would cause a downgrade in its credit, preventing it from raising funds in the credit markets.

63.    Standard & Poor's recently found that Athene "houses most of its business in Bermuda; therefore, its holding company, AHL, primarily relies on dividends from its Bermudian operating companies." "Further complicating the situation," according to Standard & Poor's, "is the fact that AHL is not a pure insurance holding company, as it is part of Apollo Global Management Inc. which has a large asset management business in addition [to] Athene's insurance operations."

64.    An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene due to the interdependence among captive affiliates. Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If only a fraction of that reinsurance transferred in 2021 were disallowed, Athene would face a funding shortfall. A

funding shortfall for Athene would directly impact Apollo because Athene insurance companies represent 40% of Apollo's value.

65.    Athene claims to have a "separate account" to pay Plaintiffs' and other similarly situated ATI retirees and beneficiaries their benefit payments. But, on information and belief, this separate account is not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other PRT transactions, the separate account not only holds assets supporting the contract, but assets in the separate account may also be used to support Athene's payment obligations under other, separate GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

66.    Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies: "[s]uch PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]" Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

67.    Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. Provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

**B.** **Athene's creditworthiness and risky offshore practices.**

*1.* *Objective measures illustrate that Athene was not the safest annuity available.*

68. On October 13, 2022, NISA reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene.[2] NISA performed its evaluation consistent with the framework outlined by IB 95-1. The report found, among other things, that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

69. To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%." As shown above NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last among annuity providers. The NISA report demonstrates that Athene is a much riskier annuity provider than traditional options.

---

[2] David Eichorn, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA Investment Advisors, LLC (2022), https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

70.    Other objective measures from the NISA report further illustrate that Athene was not the safest available annuity. The bond market uses the spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. As seen in the chart, Athene had the highest reported spread of 214 basis points ("bps"). Accordingly, all else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. But for annuitants in a PRT transaction, they are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider like Athene.

71.    Further still, Athene was also classified by NISA as a "Questionable Candidate" that "demands extenuating circumstances" when assessing whether Athene was among the safest annuity providers in the market. The reported market spread, market price for risks assumed, and the economic loss to annuitants are all significantly higher than the same measures for other annuity providers, including New York Life. At least three providers were found to be "Clear Candidates" for a PRT transaction. Among annuity providers examined, Athene cannot be considered the "safest available" annuity.

72.    IB 95-1 makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." In light of this guidance, NISA separately compared the agency rating of Athene to the market-adjusted implied rating.



FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

|  | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

73.    The reported range above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch"). By agency, the ratings range as follows from highest to lowest: S&P (AAA to D), Moody's (Aaa to C), and Fitch (AAA to C).

74.    NISA found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

75.    Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater

creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings correspond to insurers' likelihood of default.

76.    For instance, Athene maintains an A1 rating issued by Moody's, in contrast to New York Life's Moody's-issued AAA. Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to the obligations to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. It can be expected that if extended to a 30-year time horizon, this differential would grow exponentially.

### 2.    *Even if insurance rating services' opinions were dispositive, Athene was not the safest available annuity provider.*

77.    On October 6, 2023, a prominent rating agency gave New York Life one of its highest ratings based on New York Life's (1) leading market position, noting New York Life's diversified portfolio and extremely strong capital levels. But on the same date, the same prominent rating agency gave Athene much lower ratings. In describing Athene, the prominent rating agency opined that given Athene's non-traditional asset mix, Athene likely would experience realized losses in a stressed market environment. The prominent rating agency also noted that Athene's ratings are skewed because of a lack of transparency into its offshore captive reinsurance affiliates in Bermuda. According to the rating agency, Athene's offshore captive reinsurance scheme allows Athene to access third-party capital to support both organic and inorganic growth, so that to the extent Athene has ceded any business to its offshore captive reinsurance affiliates, any underperformance of that ceded business most likely would lead to Athene's undercapitalization, as Athene ultimately remains liable for honoring the obligations underlying the ceded business.

The prominent rating agency explained that these risks of Athene's undercapitalization due to its ceded assets' underperformance may become more pronounced should Athene continue to cede business to its offshore captive reinsurance affiliates in Bermuda.

78.     Another prominent credit rating agency also rated both New York Life and Athene in 2023. On November 17, 2023, the prominent agency gave New York Life a very high rating, noting New York Life's ability to pay its claims, and to repay its obligations, promptly. According to the rating agency, New York Life's overall governance model is grounded in its mutual ownership structure, prioritizing conservative risk and governance practices. The rating agency found that New York Life is strongly committed to its policyholders, writing business in which risks are borne by both New York Life and its customers—and in which customers are compensated for that risk in the form of dividend payments.  Additionally, the rating agency found that New York Life's management is dedicated to its policyholder-oriented principles, which are aligned with the interests of New York Life's other creditors.  Meanwhile, on July 17, 2023, the same prominent rating agency gave Athene a much lower rating, noting among other things that (1) Athene's portfolio has an unusually high concentration of senior and subordinated structured assets (like ABS and CLOs) compared with other similarly rated insurance peers, which could jeopardize Athene's solvency in the event of an interest rate hike, and (2) Athene's rapid expansion in to pension risk transfers has increased Athene's asset and liability management risk (*i.e.*, a mismatch between liabilities due and assets on hand to pay those liabilities).

### 3.      Athene relies on unreliable private letter ratings.

79.     Athene depends on "private letter ratings" from smaller private credit rating agencies. These private rating agencies apply less stringent standards for ratings than public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit

reporting agencies. There are significant discrepancies among securities ratings provided by private ratings agencies— Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

80.    In 2019, the Wall Street Journal ("WSJ") reported the same discrepancies among structured security ratings, including CLOs: smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. This resulted in the classification of a bond as "junk" by major rating agencies whereas the smaller, private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. Private letter ratings that carry a higher credit rating than the SVO designation, for example, result in lower RBC requirements, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolios.

81.    Both KBRA and DBRS have been subject to investigations by the SEC regarding their inaccurate rating practices, resulting in millions of dollars in fines. In one settlement, KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

**4.      Athene has been the subject of investigation by insurance regulators.**

82.      Athene has been investigated by the State of New York for misconduct regarding its PRT business and was found to have violated New York law. Relative to other states, New York state maintains some of the strictest standards on insurers. In January 2019, the New York Department of Financial Services investigated Athene Annuity and Life Company and Athene Holding Ltd., concluding that Athene Annuity and Life Company violated New York law by transacting insurance business related to its PRT business without a license from the State. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were jointly ordered to pay a $45 million civil penalty and satisfy other conditions. These other conditions included, among other things, prohibiting Athene Annuity and Life Company from soliciting, negotiating, selling, or servicing any PRT transactions, group annuity contracts, or related certificates in New York except through its subsidiary, Athene New York.

**IV.      State Street was not independent because it has been a major shareholder in ATI since 2020, and it was a major shareholder in Apollo in 2023.**

83.      State Street and its affiliates have held substantial ownership of ATI's common securities since 2012, consistently holding more than five percent of all of ATI's outstanding, publicly traded equity securities for most years since 2017. Holders of publicly traded securities are entitled to vote on matters affecting corporate governance, including members of the board, shareholder resolutions, and the like. According to SEC rules, any person who acquires a beneficial ownership interest of more than five percent of certain classes of certain equity securities must file a Schedule 13 annually with the SEC to ensure that investors and the market have accurate information about potential changes in corporate control. Given these requirements and State

Street's significant ownership interest in ATI, State Street was required to file Schedules 13 concerning its ATI holdings for 2012, 2013, 2016, 2017, 2020, 2021, 2022, and 2023.

84.    In 2012 and 2013, State Street held between 4.85 million and 5.72 million common ATI shares, an ownership interest ranging between 4.5% and 5.3% of ATI, valued between approximately $173.0 million and $173.5 million (*i.e.*, between approximately $233.3 million and $237.4 million in 2024 dollars). In 2016 and 2017, State Street held between 5.56 million and 5.88 million common ATI shares, an ownership interest ranging between 4.67% and 5.11% of ATI, valued between approximately $88.6 million and $141.9 million (*i.e.*, between approximately $115.9 million and $181.9 million in 2024 dollars). In 2020 through 2023, State Street held between 6.68 million and 8.66 million ATI shares, an ownership interest ranging between 5.27% and 6.81% of ATI, valued between $112.4 million and $306.6 million (*i.e.*, between approximately $136.4 million and $316.1 million in 2024 dollars).

85.    State Street is also one of the largest shareholders of Apollo. As of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion. State Street also provides custodial services for Athene insurance products.

86.    Because State Street held such significant positions in ATI and Apollo in 2023, it had a self-interest in increasing the value of its equity positions in both companies. State Street had an interest in favoring ATI by selecting an annuity provider that provided reduced premium payments relative to established and reputable insurance providers, thereby providing a direct financial benefit to ATI and its shareholders. Like most publicly traded companies, ATI holds an annual shareholders' meeting at which its shareholders, including State Street, are entitled to vote on a wide range of corporate strategic and governance issues, including those relating to the

appointment, composition, and pay of board members. Shareholders, including proxy shareholders, generally receive ballots each year that also generally include proposals for strategic investments. State Street's significant holdings in ATI's common stock before, during, and after the October 2023 PRT gave State Street the ability to influence ATI's strategies and activities.

87.    Studies show that large shareholders (like State Street) also have an incentive to provide more favorable advice for the management of public companies that are their clients (like ATI) than for others that are not, and such incentives often exist where, as here, there is a side-agreement between the large shareholder and the public company at issue. Public companies (like ATI) are incentivized to buy products and services from their large shareholders (like State Street) so that the large shareholders maintain or increase their ownership positions. These relationships incentivize large shareholders to exercise their proxy voting power to favor management-friendly resolutions. Therefore, State Street did not act as an "independent" fiduciary with respect to the October 2023 PRT transaction. Instead, State Street's interests were directly aligned with the ATI Defendants' and Athene's: to maximize profit, even if this meant choosing an annuity provider that did not offer the safest annuity product available and did not have the highest claims paying ability.

**V.    The ATI-State Street-Athene PRT in October 2023.**

88.    On October 18, 2023, ATI announced to its shareholders that it "will purchase group annuity contracts from each of [Athene Iowa] and [Athene New York], transferring approximately 85% of its U.S. qualified defined benefit pension plan obligations to Athene," which represented $1.5 billion of its $1.77 billion in liabilities on December 31, 2022. ATI transferred the gross pension obligations and related plan assets for approximately 8,200 Plan participants to Athene, effective as of October 17, 2023. As a result of the transaction, the value of the annuity benefits

Plaintiffs are now receiving from Athene is substantially less than the value of the pension benefits they were receiving, and entitled to receive, from ATI.

89.    The same day, ATI announced to Plan participants that it had appointed State Street as the independent fiduciary charged with choosing an annuity provider. At all relevant times, State Street's website represented to the public that its services include "[i]nsurance provider selection for annuitizing defined benefit plans (in accordance with the Department of Labor's Interpretive Bulletin 95-1)[.]" The ATI Defendants engaged State Street to assist ATI in offloading its pension liabilities. Specifically, the ATI Defendants sought assistance from State Street's "Independent Fiduciary Services team." A key service offered by State Street's Independent Fiduciary Services team—and, according to State Street, one of the leading "reasons why companies decide to hire" purportedly independent fiduciaries like it—is that State Street's role as a third-party and allegedly "neutral" advisor "may help in the event of litigation."[3] State Street touts to the public that it is "[b]lazing the trail into the mega-pension transfer market."

90.    When advising the ATI Defendants to offload their pension obligations to Athene, State Street was acting as a fiduciary to the Plan—a fact that Defendants have affirmed multiple times in their public statements and in filings with the SEC. As the Plan's independent fiduciary, State Street was held to the same stringent fiduciary standards as the ATI Defendants. For its fiduciary services, State Street received financial compensation for the services that it provided to the ATI Defendants.

---

[3] STATE STREET GLOBAL ADVISORS, *DC DNA: How Independent Fiduciary Services Evolved and What It Means Today* (State Street Corp., Oct. 31, 2023), https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved/.

91.    ATI, acting on State Street's advice, entered into an agreement with Athene on or about October 17, 2023. By that agreement, ATI purchased GACs from Athene in exchange for Athene assuming approximately $1.5 billion of the Plan's defined benefit pension obligations. The GACs cover approximately 8,200 Plan participants and beneficiaries, none of whom had any say in the transfer of their benefits to Athene.

92.    Athene is now solely responsible for paying the pension benefits of the Plan participants and beneficiaries covered by the transaction, who are no longer subject to ERISA's protections for employee benefits, including the backstop provided by the PBGC.

93.    Even though ATI retirees had no ability to choose their annuity provider, Plan assets transferred to Athene in connection with the at-issue PRT transaction cannot be withdrawn by retirees. Athene's obligation to Plaintiffs and similarly situated ATI retirees likewise is irrevocable. Thus, the individuals affected by the transaction are exposed to the substantial risk that Athene's risky, Bermuda-based activities may render it insolvent and thus unable to perform its obligations to Plaintiffs and other similarly situated ATI retirees and beneficiaries. Thus, an ATI retiree with a lower risk appetite did not have the option to transfer benefits to a safer, less risky alternative.

94.    Under the circumstances then prevailing, State Street selected or recommended Athene as the annuity provider in the PRT in violation of its obligations as an independent fiduciary by failing to conduct a thorough and objective investigation of available annuity providers for the Plan. Had State Street conducted an impartial investigation of available annuity providers, it would have discovered that Athene was not the safest available option to select as an annuity provider and that Athene did not have the highest claims-paying ability among all annuity providers. There were numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not the safest annuity available, including Athene's complex investment structure and offshore

practices, focus on private equity, questionable creditworthiness, and use of untrustworthy credit rating agencies.

**VI.    Defendants acted in their own self-interest in selecting Athene.**

95.    Defendants violated their strict fiduciary duties by selecting, and then causing the offloading of billions of dollars of the Plan participants' retirement assets to, Athene. They placed their own monetary interests ahead of Plaintiffs' interests and those of other similarly situated ATI retirees and beneficiaries and failed to conduct a thorough and independent investigation of available annuity providers for the Plan. Relative to traditional annuity providers, Athene is far riskier.

96.    In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene. There were numerous factors that would and should have led a fiduciary to conclude that Athene was not the safest annuity provider available: (i) Athene lacks a sufficient track record to guarantee pension liabilities; (ii) Athene invests in riskier assets; (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene, which are regulated by Bermuda standards, not by U.S. SAP; (iv) Athene employs questionable accounting strategies to overvalue its assets and understate its liabilities; (v) Athene uses excessive amounts of ModCo to artificially inflate its RBC ratio; and (vi) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

97.    Although the ATI Defendants ostensibly hired State Street as an independent fiduciary to select Athene, the ATI Defendants maintained full responsibility as appointing fiduciaries to monitor State Street to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its

participants when the delegate fails to discharge its duties. The ATI Defendants also had a duty to prevent any fiduciary breach by State Street in the selection of Athene as the annuity provider and to ensure that State Street was performing its delegated tasks in accordance with ERISA's fiduciary standards. The ATI Defendants failed to prudently discharge their fiduciary duties in monitoring State Street.

98.    In the PRT industry, plan fiduciaries customarily solicit competitive bids from insurers to ascertain whether a proposed transfer is in the best interest of the plan participants. Given the extensive information available to Defendants that would have led a prudent fiduciary to reject Athene given its abominable creditworthiness and other deficiencies, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Without such a reasoned, prudent, and objective decision-making process, Defendants could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of the Plan's participants and beneficiaries. Had Defendants engaged in the deliberative process that ERISA mandates, Defendants would have known that Athene was not the safest available annuity provider, and they would not have placed Plaintiffs' pension benefits and future retirement income payments at substantial risk of Athene's insolvency, incapacity, inability, or other unwillingness to perform.

99.    Defendants' decision to use Athene as the annuity provider harmed, and will continue to harm, Plaintiffs and other similarly situated ATI retirees and beneficiaries over an extended period of time through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers. Investors in the market demand a risk premium to compensate them for exposure to higher risk. But here, Plan participants and beneficiaries receive

no additional compensation for taking on the additional risk of having their pension benefits offloaded to Athene.

100.    IB 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, the ATI Defendants received an economic benefit from using Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life. Even if Athene's pricing had not been more favorable to ATI than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with IB 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity provider available.

101.    As the number of PRT transactions has dramatically increased due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the significant role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown below:



102.    Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. Among partial buyouts completed in 2022, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

103.    The ATI Defendants received an economic benefit from using Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life, to provide the same pension benefits to Plan participants.

104.    Prior to October 2023, the Plan had been underfunded. By transferring ATI's pension obligations to Athene, Defendants caused ATI to realize a gain of $210 million on its balance sheet, thereby relieving ATI of its obligation to make cash contributions to the previously underfunded Plan.

105.    Although the ATI Defendants have represented to Plaintiffs that they engaged State Street to provide "independent" fiduciary advice with respect to the transfer to ensure that the ATI Defendants selected the safest annuity provider available under ERISA, State Street's true role was to give an appearance of legitimacy to Defendants' selection of Athene. ATI's and State Street's PRT transaction with Athene was critical to Athene's success for the year, representing approximately 14.5% of Athene's sales, or $1.5 billion of the $10.4 billion Athene reported for pension group annuity sales in 2023.

106.    According to regulatory filings, at all relevant times, State Street had financial incentives to advise plan sponsors and administrators like the ATI Defendants to use Athene as the annuity provider in PRTs. State Street is also one of the largest shareholders of Apollo, Athene's parent company. And State Street provides custodial services for Athene's insurance products.

107.    Given the corporate relationship between State Street and Athene, and the numerous factors that would have led a reasonably prudent fiduciary to reject Athene as an annuity provider, it is evident that State Street selected Athene without conducting a sufficiently independent and objective evaluation of available annuity providers or, alternatively, after ignoring the risks posed by Athene. The risks posed by Athene in 2023 and years prior should have been known and were readily ascertainable to a fiduciary acting in a prudent and loyal manner. Without conducting an independent, impartial investigation aimed to identify the safest annuity provider with the highest claims-paying ability available, State Street did not and could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plaintiffs and similarly situated ATI retirees.

108.    State Street, ignoring Athene's myriad public red flags, has repeatedly rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits. Since 2018, State Street has advised plan fiduciaries to select Athene in no fewer than ten PRTs, shifting more than $30 billion in pension liabilities from the federally regulated pension system to Athene.

109.    Based upon this information and the information available to sophisticated entities like ATI and State Street, selecting Athene was an imprudent decision, even if Athene's selection had not led to the ancillary, but material, economic benefits to the ATI Defendants, and even if Athene's pricing had not been more favorable to the ATI Defendants than the pricing that a traditional annuity provider would have offered.

110.    The ATI Defendants' decision to choose State Street as an independent fiduciary for the Plan was itself a separate breach of the ATI Defendants' fiduciary duties under ERISA. The ATI Defendants either failed to engage in a thorough, independent investigation of available

independent fiduciaries for the Plan, or ignored the results of such investigations, in express contravention of the duty to act solely and exclusively for the benefit of Plaintiffs and similarly situated ATI retirees.

111.    The ATI Defendants had a motivation to favor State Street, one of ATI's largest shareholders, to financially benefit from the PRT transaction. Upon being hired as the independent fiduciary, State Street had the opportunity to use its significant market power to influence proxy voting outcomes to align with ATI management on ATI's shareholder resolutions following the October 2023 PRT. Favorable outcomes would positively impact ATI's bottom-line and the value of its common stock.

112.    Ever since ATI released its 2023 earnings statement in which it announced a $210 million offloading attributable to the October 2023 PRT, ATI's common shares have not closed below $47 per share. In 2020, ATI's common shares had an average closing price of $11.58; in 2021, ATI's common shares had an average closing price of $19.35; in 2022, ATI's common shares had an average closing price of $26.36; and in 2023, ATI's common shares had an average closing price of $40.51. During the first half of 2024, ATI's common shares had an average closing price of $50.71, some days closing near or above $60 per share.

113.    The ATI Defendants had no interest in conducting an impartial investigation. Had the ATI Defendants conducted an impartial investigation of available independent fiduciaries, they would have discovered that State Street had a relationship and dealings with Athene that impacted State Street's ability to render independent fiduciary services. The myriad of factors would have led a loyal and prudent fiduciary to conclude that Athene was not a reasonable or safe annuity provider, much less the safest annuity provider available.

**VII.    The PRT transaction diminished the value of Plaintiffs' pension benefits and substantially interfered with Plaintiffs' future payment rights**

114.    The PRT transaction to Athene immediately diminished the present value of Plaintiffs' and other similarly situated ATI retirees and beneficiaries' pension benefits. In the investment industry, risk is weighed by the market to determine the value of bonds or annuities. For a bond, the higher the risk, the greater return or spread required by the market. As such, if an annuitant receives the same payments, but from a less creditworthy issuer, the annuitant experiences a loss. This is because the market assigns a lower price for an annuity issued by a riskier provider to cover a similar stream of future payment obligations to compensate the annuitant for the additional risk of future loss. The price (*i.e.*, present value) of future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate an annuitant for assuming additional risk of loss, the lower the present value of the annuity.

115.    As of October 17, 2023, the value of ATI retirees and beneficiaries' pension benefits and rights of future retirement payments is substantially less than it would be had Defendants selected a more traditional, reputable, and stable annuity provider instead of Athene. If the Athene GAC at issue here were offered on the open market alongside traditional issuers' annuity products with identical terms and for the same price, then any rational retirement investor would choose any one of the traditional issuer's annuity products and would not choose Athene's. Alternatively, a rational retirement investor would insist on paying a lower price for the Athene-issued annuity, as its present value is substantially less than most other traditional, reputable, and stable annuity products' present values. The diminution in present value of Plaintiffs and similarly situated ATI retirees and beneficiaries' pension benefits as a result of Defendants' wrongful acts and omissions is substantial.

116.    For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. Thus, a higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume.

117.    Because of the transaction, Plaintiffs are no longer members of the Plan, their retirement benefits are not protected under ERISA. The PRT transaction thus greatly increased the risk—and indeed introduced a substantial risk—that Plaintiffs will not receive the retirement benefits they earned and are owed. Defendants' selection of Athene injured Plaintiffs at the very moment that the transaction was consummated.

118.    Had Defendants not engaged in the acts and omissions alleged to be unlawful herein, Plaintiffs would not have been injured because: (1) the present value of their pension benefits (including the right of future retirement income payments) would not have been substantially diminished; and (2) even if ATI had at some point in the future become unable or unwilling to honor its obligations, the PBGC would have served as the backstop to mitigate Plaintiffs' losses.

## CLASS ACTION ALLEGATIONS

119.    Plaintiffs seek class action certification on behalf of all participants in the Allegheny Technologies Incorporated Pension Plan and their beneficiaries since October 17, 2023 for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

120.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The proposed class includes approximately 8,200 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.    Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plan and were subjected to Defendants' conduct in transferring ATI's benefit payments to the Athene entities.

d.    Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.    The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

121.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo,

*Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breaches of Fiduciary Duty against all Defendants Regarding Athene

122.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

123.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan and transactions at issue.

124.    As such, Defendants were required to discharge their duties with respect to the Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's participants and beneficiaries and defraying reasonable expenses of administering the Plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

125.    IB 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

126.    Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving ATI money and enhancing corporate profits. State Street was conflicted, and its selection or recommendation of Athene was influenced by its relationships with ATI, Athene, and affiliates rather than through an objective and thorough independent investigation into the merits of whether Athene was the safest annuity provider available or whether Athene had the highest claims paying ability. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because the ATI Defendants' goal and motivation was to save ATI money, and State Street's goal and motivation was to benefit itself and its corporate partner, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

127.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

128.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings realized by Defendants by virtue of purchasing Athene annuities instead of the safest possible annuity and the

posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

129.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

### Knowing Participation in Fiduciary Breaches against the ATI Defendants

130.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

131.    An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring an action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. 29 U.S.C. § 1132(a)(9). Section § 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduciaries who knowingly participate in a fiduciary breach under § 1104.

132.    Plaintiffs allege that, even if any of the ATI Defendants did not act as fiduciaries with respect to the selection of Athene, then in the alternative to Count I, such Defendants are liable under § 1132(a)(9) for knowing participation in the breach of the fiduciaries who selected Athene. Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's conduct a breach of fiduciary duties. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was not objective or sufficiently thorough.

These Defendants also knew that the ATI Defendants' retention of State Street instead of a truly independent fiduciary, or State Street's deficient selection/recommendation of Athene instead of a prudent alternative annuity provider, would generate a massive monetary benefit for the ATI Defendants, and then knowingly accepted that benefit.

## COUNT III

### Prohibited Transactions against the ATI Defendants for Hiring State Street

133.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

134.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

135.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank*, 530 U.S. at 242, such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

136.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

137.    State Street was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). The ATI Defendants knowingly caused the Plan to engage in transactions resulting in a direct or indirect furnishing of services between the Plan and State Street. U.S.C. § 1106(a)(1)(C).

138.    The ATI Defendants entered into a prohibited transaction when they engaged State Street as the Plan's independent fiduciary, which facilitated the subsequent selection of Athene and harmed Plaintiffs and class members.

139.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

140.    By using pension trust assets to pay State Street – a party in interest that was not independent – the ATI Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party whose interest in using a riskier, lower-cost annuity provider was averse to the interests of the Plan participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

141.    Each ATI Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by ATI by virtue of engaging State Street instead of a truly independent fiduciary and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

142.    Each ATI Defendant knowingly participated in the breach of the other ATI Defendants, knowing that such acts were a breach, enabled the other ATI Defendants to commit a breach by failing to lawfully discharge his, her, or its own fiduciary duties, knew of the breach by the other ATI Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of his, her, or its co-fiduciary under 29 U.S.C. § 1105(a).

143.    Even if the ATI Defendants did not act as fiduciaries over the selection of State Street, each ATI Defendant is still liable as a nonfiduciary party in interest who knowingly participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee

of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. The ATI Defendants had actual or constructive knowledge that engaging State Street – a party in interest – as an "independent" fiduciary was unlawful, and thus knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer assets intended to fund the Plaintiffs' pension benefits to State Street, for State Street's immediate profit.

**COUNT IV**

**Prohibited Transactions against all Defendants for Engaging in Transactions with Athene**

144.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

145.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in the transactions with Athene with actual or constructive knowledge that the transactions constituted direct or indirect (i) exchanges of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfers to, or uses by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

146.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

147.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by the ATI Defendants by virtue of purchasing Athene annuities instead of the safest available annuity and by State Street by virtue of selecting or recommending Athene annuities instead of the provider with

the highest claims-paying ability and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

148.    Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

## COUNT V

### Failure to Monitor Fiduciaries against the ATI Defendants

149.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

150.    The ATI Defendants fiduciary responsibility for overseeing the Plan included monitoring any other fiduciaries appointed or hired to manage the Plan on a day-to-day basis, and the day-to-day responsibility of selecting service providers such as an annuity provider.

151.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards. The ATI Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9), and 29 C.F.R. § 2509.95-1.

152.    Had the ATI Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Defendants would have decided not

to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

153.    Pursuant to FED. R. CIV. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transaction;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

August 2, 2024                                        Respectfully submitted,

                                                     SCHLICHTER BOGARD LLP

                                                     By: /s/ Jerome J. Schlichter

                                                     Jerome J. Schlichter (MO 32225)*
                                                     Sean E. Soyars (MO 57317)*
                                                     Kurt C. Struckhoff (MO 61873)*
                                                     Patrick R. Kutz (MO 66023)*
                                                     Terrence W. Scudieri, Jr. (NY 5761945)*
                                                     100 South Fourth Street, Suite 1200
                                                     St. Louis, Missouri 63102
                                                     Telephone: +1 (314) 621-6115
                                                     Facsimile: +1 (314) 621-5934
                                                     jschlichter@uselaws.com
                                                     ssoyars@uselaws.com
                                                     kstruckhoff@uselaws.com
                                                     pkutz@uselaws.com
                                                     tscudieri@uselaws.com

                                                     WADE KILPELA SLADE LLP

                                                     By: /s/ Edwin J. Kilpela, Jr.

                                                     Edwin J. Kilpela, Jr. (PA 201595)
                                                     Paige T. Noah (PA 327552)
                                                     6425 Living Place, Suite 200
                                                     Pittsburgh, PA 15206
                                                     Telephone: +1 (412) 314-0515
                                                     ek@waykayslay.com
                                                     Email: pnoah@waykayslay.com

                                                     * Applications for admission *pro hac vice*
                                                     forthcoming

                                                     *Counsel for Plaintiffs & the Proposed Class*