**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM L. SCHOEN, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ATI INC., *et al.*,**<br><br>**Defendants.** | **Civil Action No. 2:24-cv-01109-JNR-KT** |

**ATI, INC.'S AND THE ALLEGHENY TECHNOLOGIES INCORPORATED PLAN ADMINISTRATIVE COMMITTEE'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION ON THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 3

ARGUMENT ..... 6

I. PLAINTIFFS FAILED TO PLEAD AN "ACTUAL" INJURY UNDER ARTICLE III. ..... 7

A. Plaintiffs' "Present Value" Injury Theory Fails ..... 8

B. Plaintiffs' Reliance on Contract Principles and *TransUnion* Fails ..... 11

C. Engaging in a PRT Does Not by Itself Create an Actual Injury ..... 13

II. PLAINTIFFS FAILED TO PLEAD AN "IMMINENT" INJURY UNDER ARTICLE III. ..... 14

III. PLAINTIFFS CANNOT AVOID PLEADING AN INJURY BY SEEKING EQUITABLE RELIEF ..... 18

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beck v. PACE Int'l Union*,
551 U.S. 96 (2007)....4, 13

*Bueno v. Gen. Elec. Co.*,
2025 WL 2719995 (N.D.N.Y. Sept. 24, 2025).... *passim*

*Camire v. Alcoa USA Corp.*,
2025 WL 947526 (D.D.C. Mar. 28, 2025).... *passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 .... *passim*

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023)....13

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013) ....8

*Doherty v. Bristol-Myers Squibb Co.*,
2025 WL 2774406 (S.D.N.Y. Sept. 29, 2025)....14, 18

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013)....19, 20

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024)....2, 6, 14

*Franchise Tx. Bd. of Cal. V. Alcan Alum. Ltd.*,
493 U.S. 331 (1990)....10

*Gollust v. Mendell*,
501 U.S. 115 (1991)....10

*Jones v. Sears Roebuck & Co.*,
301 F. App'x 276 (4th Cir. Nov. 10, 2008) ....14

*Knudsen v. MetLife Grp, Inc.*,
117 F.4th 570 (3d Cir. 2024) ....4, 14

*Konya v. Lockheed Martin Corp.*,
2025 WL 962066 (D. Md. Mar. 28, 2025)....18, 20

**TABLE OF AUTHORITIES**

**Page**

*Krauter v. Siemens Corp.*,
725 F. App'x 102 (3d Cir. Feb. 16, 2018) ........ *passim*

*Lee v. Verizon Commc'ns, Inc.*,
837 F.3d 523 (5th Cir. 2016) ........ 4, 8, 9, 13, 14

*Luca McDermott Catena Gift Tr. v. Fructoso-Hobbs SL*,
102 F.4th 1314 (Fed. Cir. 2024) ........ 10

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ........ 10

*Perelman v. Perelman*,
793 F.3d 368 (3d Cir. 2015) ........ *passim*

*Peters v. Aetna, Inc.*,
2 F.4th 199 (4th Cir. 2021) ........ 20

*Piercy v. AT&T, Inc.*,
2025 WL 2505660 (D. Mass. Aug. 29, 2025) ........ 11

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011) ........ 15, 18

*Ross v. Bank of America, N.A.*,
524 F.3d 217 (2d Cir. 2008) ........ 14

*Saba Cap. CEF Opps. 1, Ltd. v. Nuveen Floating Rate Income Fund*,
88 F.4th 103 (2d Cir. 2023) ........ 10

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ........ 5

*Sloat through Loudon v. Active Day, Inc.*,
2024 WL 4654161 (D.S.C. Mar. 28, 2024) ........ 14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 6

*Thole v. US Bank N.A.*,
590 U.S. 538 (2020) ........ *passim*

*Tiger v. Verizon Commc'ns Inc.*,
2025 WL 437019 (W.D. Pa. Feb. 7, 2025) ........ 6

## TABLE OF AUTHORITIES

**Page**

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................................................................................*passim*

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977)..............................................................................................................10

**Statutes**

29 U.S.C. § 1132(a)(9)........................................................................................................13

29 U.S.C. § 1341....................................................................................................................4

Iowa Code § 507C.2.14.b ......................................................................................................5

Iowa Code § 508A.1 ..............................................................................................................5

**Other Authorities**

29 C.F.R. § 2509.95-1............................................................................................................4

## INTRODUCTION

Plaintiffs claim Defendants violated ERISA in connection with the amendment of ATI's pension plan ("Plan") to allow for a pension risk transfer ("PRT") in 2023. As a result of this ERISA-permitted transaction, Plaintiffs' pension benefits are no longer paid by the Plan but rather by two annuity contracts issued by Athene, a highly regulated and A+ rated insurance company. Plaintiffs admit that since the transaction, they have received all of their monthly pension benefits on time and in full, and that they remain legally entitled to those same benefits for life. Because Plaintiffs have not experienced an *actual* loss of pension benefits and do not plausibly allege an *imminent* loss of future pension benefits, they have no cognizable injury under Article III. That is what the Report and Recommendation ("R&R") correctly concluded, consistent with binding Supreme Court and Third Circuit precedent, multiple circuit court decisions addressing standing in the pension-benefit context, and two recent district court decisions dismissing virtually identical ERISA complaints involving Athene annuities. The Court should adopt the magistrate judge's recommendation and dismiss the Consolidated Complaint under Rule 12(b)(1).

Nothing Plaintiffs argue in their Objections ("Objs.") shows otherwise.

***First***, Plaintiffs devote most of their brief to arguing that they have already experienced an *actual* injury, even though they have not lost a penny of pension benefits. But their arguments are foreclosed by *Thole v. US Bank N.A.*, 590 U.S. 538 (2020), which affirmed the dismissal of ERISA fiduciary breach claims to recoup plan losses, disgorge profits, and obtain injunctive relief, because the plaintiffs "lack[ed] Article III standing for a simple, commonsense reason: They ha[d] received all of their vested pension benefits so far, and they [were] legally entitled to receive the same monthly payments for the rest of their lives." 590 U.S. at 547. Because the same is true here, Plaintiffs cannot establish an actual injury under Article III. *See* R&R at 7-10.

Plaintiffs disagree. Their main argument is that the theoretical "present value" of their

*future* pension payments has been reduced, based on their concern that Athene might fail to make those payments at some indeterminate future point. But this argument is foreclosed by *Thole* and other binding precedent, which make clear that *risk of future harm* is not an *actual* injury for standing purposes. Bottom line, because Plaintiffs have not lost a penny of pension benefits, they have not suffered an actual injury under Article III.

Plaintiffs further suggest that they have suffered some quasi-contractual injury based on the transfer of pension-payment responsibility to Athene. But both ERISA and the Plan expressly permit such transfers, so Plaintiffs' suggestion that they have a quasi-contractual right against such "delegations" falls flat. And while Plaintiffs repeatedly invoke *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), that case only undercuts their standing theory because it confirms that "*risk of future harm*" is not an *actual* injury under Article III, *id.* at 435. In short, despite their efforts to "make standing law more complicated than it needs to be," *Thole*, 590 U.S. at 547, Plaintiffs cannot avoid the fact that without any loss of pension benefits no "actual" injury has "already occurred." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

***Second***, Plaintiffs argue that the magistrate judge erred in concluding that they failed to plead an *imminent* future injury. To do so, Plaintiffs must allege facts plausibly showing a "substantial risk" that Athene will default on Plaintiffs' future pension benefits, or put differently, that Athene's default is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 & 414 n.5 (2013). Plaintiffs failed to do so. While lengthy, their allegations boil down to an argument that although Athene is a highly regulated and A+ rated insurer, it is "riskier" than other insurers and thus not the "safest available" annuity provider. Even if true, this does not suggest that Athene will ever default on Plaintiffs' benefits—much less *imminently*. *See* R&R at 11-13.

Plaintiffs' own allegations prove the point, because they acknowledge that multiple layers

of enormous financial protection would all have to fail before Plaintiffs would lose any pension benefits. Their theory goes like this: *If* the "separate account" Athene maintains to pay pension benefits were somehow exhausted, and *if* Athene's even larger "general account" were insufficient to make up the difference, and *if* the "reinsurance" Athene maintains to further guarantee its pension liability fell through, and *if* Plaintiffs' benefits also exceed the amounts guaranteed by their state insurance guarantee associations, then their benefits might be reduced. However, Plaintiffs do not allege that any one of these layers of financial protection is likely to fail, let alone that they will *all* fail *imminently*. Their future injury theory is far too speculative and conjectural to satisfy Article III, as the magistrate judge correctly concluded.

***Third***, Plaintiffs argue that they should not have to plead any injury because they seek equitable relief under ERISA. The magistrate judge correctly rejected this argument, too, because it is foreclosed by *Thole*. *See* R&R at 10-11. This Court should do the same.

For these reasons, the Court should adopt the magistrate judge's recommendation and dismiss the Consolidated Complaint for lack of Article III standing.

## BACKGROUND

The Allegheny Technologies Incorporated Pension Plan ("Plan") is a defined-benefit plan under ERISA. Consolidated Complaint ("CC" or "Complaint") ¶¶ 10, 12-16, 28. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole*, 590 U.S. at 540. In other words, participants are entitled to their promised benefits, regardless of the value, performance, or risk of the plan's underlying assets. As such, "the employer, not participants" is entitled to "any surplus left over [in the plan] after all of the benefits are paid," and participants have "no equitable or property interest" in the plan or the assets that are used to fund their pension benefits. *Id.* at 543.

To manage their pension liability, ERISA allows employers to transfer responsibility for paying pension benefits—along with plan assets needed to do so[1]—to an insurer under an annuity contract. *See* 29 U.S.C. § 1341; 29 C.F.R. § 2509.95-1. These transactions are called pension risk transfers, or PRTs, because they transfer risk associated with pension assets and liability to insurers, who specialize in managing such risk. An employer's decision to engage in a PRT is "settlor" conduct, not fiduciary conduct, so it is exempt from ERISA's fiduciary duty provisions. *See, e.g.*, *Beck v. PACE Int'l Union*, 551 U.S. 96, 101-09 (2007); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 537 (5th Cir. 2016) ("[T]he decision to transfer pension assets outside ERISA coverage [through a PRT] [is] a sponsor decision immune from fiduciary obligations.").

In 2023, ATI amended the Plan to provide that Plaintiffs' and other retirees' benefits would be paid under an annuity contract issued by an insurer. CC ¶ 109; ECF 58-2, Plan Amend. The Plan amendment also provided that a professional "independent fiduciary," Defendant State Street Global Advisors Trust Co. ("SSGA"), would have "full discretionary authority" to select the insurer and direct the annuity purchase. CC ¶ 21; ECF 58-2.[2] Ultimately, SSGA selected and directed the purchase of two group annuity contracts ("GACs") issued by two insurance companies

---

[1] Transferred plan assets constitute the annuity's "premium." A competitive premium for a PRT annuity is 99.7% to 102.8% of the present value of pension liability transferred. *See* CC ¶ 125. Here, Plaintiffs allege that $1.5 billion in liability was transferred to Athene, so approximately $1.5 billion in Plan assets were transferred as the "premium" to fund that liability. CC ¶¶ 3, 132. Athene was required to deposit the entire premium into the "Separate Account" maintained to fund its pension obligations. *See* ECF 58 at 6 n.11; ECF 58-5, GAC (Iowa) § 1.2. The Court may consider the Plan and annuity contracts here because they are referenced in and integral to the Complaint. *See Knudsen v. MetLife Grp, Inc.*, 117 F.4th 570, 577 n.33 (3d Cir. 2024) ("We are free to review several Plan documents" and the "PBM Agreement" relating to plaintiffs' claims).

[2] While the decision to engage in a PRT is not fiduciary conduct, the decision about which insurance company to select to implement the PRT is fiduciary conduct. *Beck*, 551 U.S. at 102.

known collectively as "Athene." CC ¶ 3.[3] Under those contracts, Plaintiffs and other retirees are entitled to the same pension benefits to which they were entitled under the Plan. CC ¶¶ 12-16, 30; ECF 58-2, § 1(d). Plaintiffs admit that, in the years since the transfer to Athene, they have continued to receive all of their monthly pension payments and that they remain entitled to those same payments for life. R&R at 9; CC ¶¶ 12-16.

As the Complaint acknowledges, Athene maintains a "[S]eparate [A]ccount" to fund its PRT pension obligations. CC ¶ 72; ECF 58 at 6; ECF 58-5, at 4. By law, separate accounts are insulated from an insurer's general liabilities, even in the event of insolvency.[4] As of December 31, 2023, Athene's separate account held over $51 billion in assets, including a surplus of more than $875 million relative to liabilities.[5] Thus, Athene's pension liabilities were overfunded.

According to the Complaint, if Athene's Separate Account were exhausted, Athene would "then" tap its "general account" assets to fund pension benefits. CC ¶ 72. As of December 31, 2023, Athene's holding company reported $300 billion in assets, including a $21.8 billion surplus.[6] The Complaint continues that, if "the separate account and then the general account" were "insufficient to cover its [pension] liabilities, Athene would be forced to seek payment from its affiliated reinsurer," CC ¶ 72, which provides insurance to cover Athene's pension liability, CC ¶ 51. Finally, Plaintiffs allege that they are also "protected by state guarantee associations," which guarantee each annuitant's benefit up to $250,000. CC ¶¶ 34-35; ECF 58 at 6-7.

---

[3] The Athene companies are: (1) Athene Annuity and Life Co., which is an Iowa-based insurance company; and (2) Athene Annuity & Life Assurance Company of New York. CC ¶¶ 3, 110.

[4] ECF 58 at 6 n.12; Iowa Code §§ 507C.2.14.b, 508A.1; ECF 58-5, § 1.5.

[5] These figures come from Athene's public filings, so the Court may properly consider them. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); ECF 58, at 6 n. 14; ECF 58-7, at p. 2, line 16 ($51.5 B in assets) & p. 3, line 21 ($875 M surplus).

[6] The figures come from Athene's public filings. *See* ECF 58 at 8 nn.24-25 (citing SEC filings).

According to the Complaint, Athene was not the "safest available" annuity provider that SSGA could have selected. CC ¶ 4. The Complaint makes numerous allegations to support its assertion that Athene is "riskier" than "traditional" insurance companies. CC ¶¶ 50-99. However, the Complaint also acknowledges that Athene has A+/A1 credit ratings. *See* CC ¶ 93 (chart noting Athene's A+ credit rating); ECF 58 at 9 (citing SEC filings). For example, Athene has an "A1" rating from Moody's, and Plaintiffs allege that among insurers with a *lower* "A" rating from Moody's, the default rate is only 5% over a "20-year time horizon." CC ¶ 97.[7]

**ARGUMENT**

Plaintiffs bear the burden of pleading the three elements of Article III standing: "(i) an injury-in-fact; (2) fairly traceable to the defendant's conduct; and (iii) capable and likely of being prevented or redressed through the exercise of traditional judicial powers." *Tiger v. Verizon Commc'ns Inc.*, 2025 WL 437019, at *2 (W.D. Pa. Feb. 7, 2025) (Ranjan, J.) (quotation/citation omitted). Here, the magistrate judge correctly concluded that Plaintiffs failed at the first step.

To establish an injury-in-fact, Plaintiffs must allege a "concrete" injury that is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (cleaned up). The injury must be "*actual* or *imminent*, not speculative—meaning that the injury must have *already occurred* or be *likely to occur soon*." *FDA*, 602 U.S. at 381 (emphasis added). Applying these elements, the magistrate judge correctly concluded that Plaintiffs have failed to plead a concrete injury that is either *actual* or *imminent* under Article III. The magistrate judge also correctly rejected Plaintiffs' argument that they need not plead any personal injury because they seek equitable relief under ERISA. We address these three points and Plaintiffs' objections to them, in turn, below.

---

[7] The Complaint mistakenly alleges that Athene's Moody's rating was A, CC ¶ 97, but as SEC filings the Court may consider confirm, Athene had an A1 rating from Moody's. ECF 58 at 9.

## I. Plaintiffs Failed to Plead an "Actual" Injury Under Article III.

Plaintiffs cannot plead an *actual* injury under Article III "for a simple commonsense reason: They have received all of their vested pension benefits so far, and they are legally entitled to those same monthly payments for the rest of their lives." *Thole*, 590 U.S. at 547. The Supreme Court's decision in *Thole* disposes of Plaintiffs' attempt to plead an actual injury in this case, as the magistrate judge concluded, and other district courts have held.

In *Thole*, the plaintiffs sued defined-benefit plan fiduciaries under ERISA for imprudently and disloyally managing their pension plan, resulting in "$750 million in losses" that caused the plan to be "underfunded for a period of time." *Id.* at 541, 546. Not only had the defendants imprudently invested *all* plan assets in high-risk equities, but they also used "the plan's assets as a personal piggy bank" by funneling them into affiliate companies to generate fees and revenue for their own profit. *Id.* at 545. As relief, plaintiffs sought the "restoration of losses, disgorgement of ill-gotten profits and fees, removal of the disloyal fiduciaries, and an injunction to stop the ongoing breaches." *Id.* at 551 (Sotomayor, J., dissenting). However, the Supreme Court affirmed dismissal because the plaintiffs lacked Article III standing.

As the Supreme Court explained, the plaintiffs' only legal entitlement was to "receive a fixed payment each month," and that entitlement did "not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* at 540. Further, as defined-benefit plan participants, the plaintiffs "possess[ed] no equitable or property interest in the plan" or the plan assets used to fund benefits. *Id.* at 542-43. So even assuming the defendants had harmed the value of *the plan's* assets and profited from their misuse of *the plan's* assets, the plaintiffs remained uninjured because they had not lost a penny of pension benefits. *Id.* at 547.

The same analysis applies here. As in *Thole*, Plaintiffs have admittedly received all of their monthly pension benefits from Athene, and they remain legally entitled to those same benefits for

life under the applicable annuity contracts. R&R at 8. Thus, they have suffered no actual injury to their promised benefits. This conclusion is also consistent with Third Circuit precedent and other circuit court decisions pre-dating *Thole*. *See Krauter v. Siemens Corp.*, 725 F. App'x 102, 106-08 (3d Cir. Feb. 16, 2018) (no standing to challenge pension transfer because transferee had not "failed to pay [the plaintiff] any benefits" and alleged risk of nonpayment was "too speculative"); *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015) (no standing absent an actual or imminent non-payment of benefits); *Lee*, 837 F.3d at 546 (no standing despite fiduciary breaches resulting in $2 billion in pension losses and severe underfunding, because plaintiffs continued to receive their pension payments); *David v. Alphin*, 704 F.3d 327, 336-38 (4th Cir. 2013) (no standing because plaintiffs continued to receive pension payments). Unsurprisingly, then, district courts confronted with identical ERISA claims based on the selection of Athene PRT annuities have concluded that the plaintiffs experienced no actual injury under Article III. *See Bueno v. Gen. Elec. Co.*, 2025 WL 2719995, at *10-14 (N.D.N.Y. Sept. 24, 2025) (no actual injury because plaintiffs received all benefits and remained entitled to them for life); *Camire v. Alcoa USA Corp.*, 2025 WL 947526, at *4-5 (D.D.C. Mar. 28, 2025) (same).

Nevertheless, Plaintiffs argue that they have suffered an "actual" injury even though they have not lost a penny of benefits. But their arguments amount to a complicated and unsuccessful attempt to reimagine a *potential future injury* as an actual injury that has already occurred. The magistrate judge rejected these arguments, and this Court should too.

### A. Plaintiffs' "Present Value" Injury Theory Fails

According to Plaintiffs, any increased risk that Athene might someday default on their pension payments is an *actual* injury—as opposed to a potential future injury—because it reduces the theoretical "present value" of their future pension payments. Objs. at 4-9. This theory is without merit, as the magistrate judge rightly concluded. *See* ECF 58 at 20-22; ECF 73 at 2-5.

***First***, it is foreclosed by *Thole* and other ERISA pension cases. R&R at 9-10. As discussed, *Thole* squarely held that pensioners had not suffered an actual injury for Article III purposes, even though the defendants' misconduct had significantly harmed the present value of the plan and its assets, to the tune of $750 million. 590 U.S. at 541. This was because the plaintiffs continued to receive their monthly pension payments. *See id.* at 547; *accord. Perelman*, 793 F.3d at 373-74 (no standing despite "dramatically increased risk of default" on pension benefits due to plan losses and underfunding resulting from alleged misuse of plan assets); *Lee*, 837 F.3d at 546 (same). Likewise, the Third Circuit easily rejected a similar argument in *Krauter* where a pensioner alleged that fiduciaries improperly transferred responsibility for paying pension benefits to a less reliable payor, thereby increasing the risk that future benefits would not be paid: "Here again, our precedent is conclusive: a risk of future adverse effects on benefits is not in injury in fact" under Article III. 725 F. App'x at 108 (citing *Perelman*, 793 F.3d at 375).

Plaintiffs try to brush aside *Thole*, *Perelman*, *Krauter* and other cases because the plaintiffs in those cases were covered by an ERISA plan, not a group annuity contract. Objs. at 7. But that distinction makes no difference. All of the above cases involved claims that plan fiduciaries had imperiled plaintiffs' promised pension payments—either by depleting plan assets used to pay benefits (*Thole*, *Perelman*, *Lee*) or by transferring the liability to a riskier party (*Krauter*).[8] Indeed, as the *Camire* court observed, Plaintiffs' injury theory here is even more untenable than the theory

[8] Clearly, the plaintiffs in these cases faced an increased risk to their future pension benefits. However, the lesson from these cases is that the plaintiffs suffered no *actual* injury for Article III as long as their benefits continued to be paid. And while Plaintiffs emphasize that they are no longer participants in an ERISA pension plan, their own allegations highlight how Athene's annuities resemble a pension plan structure: the annuities hold assets to pay fixed benefits in a separate account (similar to a pension plan trust); they put Athene "on the hook" to fund any shortfall from its general account assets or reinsurance policies (similar to how an employer is on the hook to fund a pension plan); and they are backstopped by state insurance guarantee associations (akin to PBGC protection). *See supra* at 5; CC ¶¶ 72, 33-34.

in *Thole* because, unlike in *Thole*, they "do not allege a concrete or measurable reduction in the overall value of their plan based on poor investing decisions, but rather a *theoretical* reduction in value based on a riskier annuity provider." 2025 WL 947526, at *4 n.4 (emphasis added). The magistrate judge here correctly applied that same reasoning. R&R at 9-10.

***Second***, Plaintiffs' theory is also misguided because pension benefits have no independent market value. R&R at 9-10. Unlike the stocks, bonds, and other marketable assets in the cases Plaintiffs cite,[9] pension benefits are non-transferable. *See Id.*; ECF 58 at 20-21. Instead, pension benefits are fixed, they do not fluctuate with the value of underlying assets, and they have no independent market value in which a concrete injury can manifest. These unique features help explain why *Thole* and other courts agree that pensioners suffer no "actual" injury, provided they continue to receive their promised benefits. *See, e.g.*, *Thole*, 590 U.S. at 540; *Bueno*, 2025 WL 2719995, at *11 ("There is no suggestion that the PRT . . . resulted in [plaintiffs] being entitled to or receiving any lesser amount of benefits . . . and the cases they cite . . . involve materially distinguishable situations."). This conclusion is not, as Plaintiffs argue, "akin to saying that Social Security beneficiaries would lack Article III standing to challenge an unlawful reduction of their benefits because those benefits are not transferrable[.]" Objs. at 8-9. This strained analogy misses the point entirely, because Plaintiffs *have not experienced* any "reduction of their benefits."

[9] For example, Plaintiffs cite *Gollust v. Mendell*, 501 U.S. 115 (1991). But there, the Court held that a *corporate shareholder* had *statutory standing* to assert insider-trading claims based on the defendants' short-swing profits from selling shares of the corporation's subsidiary, *id.* at 118-121—a subsidiary that was the parent company's "only asset," and thus directly impacted the value of the plaintiff's company stock, *id.* at 127. Plaintiffs' other cases likewise involved alleged harm to the prevailing market value of securities or property. *See Franchise Tx. Bd. of Cal. V. Alcan Alum. Ltd.*, 493 U.S. 331 (1990) (marketable securities); *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977) (bonds); *Luca McDermott Catena Gift Tr. v. Fructoso-Hobbs SL*, 102 F.4th 1314 (Fed. Cir. 2024) (intellectual property); *Saba Cap. CEF Opps. 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 108, 111 (2d Cir. 2023) (mutual fund shares); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) (marketable securities).

***Third***, Plaintiffs' theory flouts other Article III precedents, too. In *Clapper*, the Supreme Court held that risk of *future* injury satisfies Article III *only* when the future injury is *imminent*—meaning the injury is "certainly impending" or poses a "substantial risk" of occurring. 568 U.S. at 414 n.5. According to Plaintiffs, however, they can avoid these requirements by simply characterizing the risk of a future benefit loss as a "present" harm. But the law says otherwise. *See TransUnion*, 594 U.S. at 435; *Clapper*, 568 U.S. at 401-02; *see also Bueno*, 2025 WL 2719995, at *11; *Camire*, 2025 WL 947526, at *3-4.[10]

### B. Plaintiffs' Reliance on Contract Principles and *TransUnion* Fails

Plaintiffs next argue that they have experienced an *actual* injury based on *TransUnion* and principles of contract law. These arguments fail, too.

In *TransUnion*, the Supreme Court recognized that some "intangible harms" can constitute concrete injuries under Article III, provided they have "a close relationship to harm traditionally recognized as providing a basis for a lawsuit." 594 U.S. at 425. The plaintiffs in that case included thousands of class members, who claimed that TransUnion illegally identified them as potential "terrorists, drug traffickers, or [other] serious criminals" in credit reports. *Id.* at 420. The Supreme Court held that class members "whose reports were disseminated to third-party businesses" had suffered an *actual* injury similar to "the reputational harm associated with the tort of defamation." *Id.* at 432. But it reached the opposite conclusion for those whose reports were *not* disseminated

[10] This Court should disregard *Piercy v. AT&T, Inc.*, 2025 WL 2505660 (D. Mass. Aug. 29, 2025), *adopted*, 2025 WL 280908 (Sept. 30, 2025), for the reasons discussed in *Bueno*: (1) the R&R adopted in *Piercy* relied on a misreading of "dicta in *Thole*," (2) "fail[ed] to cite any authority to substantiate that 'substantially increased risk' is a valid *present* injury (particularly in the relevant ERISA context)," (3) relied on a Fifth Circuit decision that was "not addressing standing in the language cited by the court," and (4) did "not appear to acknowledge the large body of case law related to future injury[.]" *Bueno*, 2025 WL 2719995, at *11 n.2.

to third parties. Those plaintiffs had experienced no "actual" reputational harm, and the mere "*risk of future harm*" if their reports were disseminated was insufficient. *Id.* at 435

Given this backdrop, it is unclear why Plaintiffs believe *TransUnion* advances their cause. If anything, the Supreme Court's application of Article III principles only confirms that Plaintiffs lack standing. Like the *TransUnion* plaintiffs who lacked standing, Plaintiffs here ground their "actual" injury arguments "on an asserted *risk of future harm*," 594 U.S. at 435—namely, the potential loss of future pension benefits. But risk of future harm was not sufficient to establish an actual (or imminent) injury in *TransUnion*, and neither is it here.

Ignoring this problem, Plaintiffs quote language in *TransUnion* to argue that the risk Athene might fail to pay benefits in the future bears a "close relationship" to harms that might arise under contract law. Objs. at 10-11. Plaintiffs say a contracting party "might sue their" counterparty for delegating its contractual duties to a third party in violation of the contract. *Id.* But an obvious problem with this argument is that both ERISA and the Plan *expressly permit* transferring responsibility for paying Plaintiffs' benefits to an insurer. There is no contractual term barring such "delegations." Nor did Plaintiffs have any contractual right to have their benefits paid only by ATI. For these same reasons, courts have rejected identical attempts in other PRT cases to manufacture an "actual" injury based on "some sort of quasi-contractual rights related to the source of their pension benefits[.]" *Bueno*, 2025 WL 2719995, at *12. Moreover, even accepting their contract analogy, Plaintiffs "must still show that the transfer of their contractual rights *concretely* harmed them in some way. And because [they] continue to receive their monthly benefits payments, they cannot clear this bar." *Camire*, 2025 WL 947526, at *4.[11]

---

[11] None of the cases Plaintiffs cite, *see* Objs. at 11, holds that a contract party suffers an Article III injury merely because a contractual duty is assigned to another entity with a different risk profile.

Plaintiffs also seize on *TransUnion*'s observation that courts "must afford due respect to Congress's decision to impose a statutory prohibition, and to grant a cause of action to sue over the defendant's violation of that prohibition[.]" 594 U.S. at 425; Objs. at 12. But it does not follow, as Plaintiffs suggest, that they have Article III standing *because* ERISA provides them with a potential cause of action. *See* 29 U.S.C. § 1132(a)(9). Indeed, the Supreme Court rejected that same argument in *Thole*, holding that the existence of a "cause of action" under ERISA "does not affect the Article III analysis," which "requires a concrete injury even in the context of a statutory violation." 590 U.S. at 544; *accord. Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 63 (W.D. Pa. 2023) (Ranjan, J.), *aff'd*, 148 F.4th 153 (3d Cir. 2025) ("Even if a plaintiff alleges a statutory violation . . . Article III still 'requires a concrete injury[.]'" (quoting *TransUnion*, 594 U.S. at 426)). Simply put, the mere fact that Plaintiffs may have statutory standing does not satisfy their burden to plead an Article III injury. *See* R&R at 11 n.5.[12]

### C. Engaging in a PRT Does Not by Itself Create an Actual Injury

Finally, Plaintiffs argue they have suffered an actual injury because their Athene annuities are not governed by ERISA, but rather by state law. Objs. at 13. But, as already discussed, ERISA expressly permits PRTs, and by design, every PRT results in pension liability being transferred outside of ERISA coverage. *See supra* at 3-4. Further, the decision to engage in a PRT is not even subject to ERISA's fiduciary duty provisions. *See id.*; *Beck*, 551 U.S. at 101-09 (2007); *Lee*, 837 F.3d at 537. Thus, the supposed "loss" of ERISA coverage is not a cognizable injury under Article III because it is the *legally permissible* result of every PRT and flows from a *non-fiduciary* decision

[12] In any event, Congress enacted 29 U.S.C. § 1132(a)(9) because courts had held that former pension plan participants *whose benefits had been cut significantly* due to the financial collapse of an annuity provider lacked *statutory* standing to sue under ERISA. Given this context, there is no reason to infer that Congress believed that plaintiffs who have suffered no actual or imminent benefit loss nonetheless have Article III standing. *See* ECF 58 at 35; ECF 73 at 11 n.9.

"immune from [ERISA's] fiduciary obligations." *Lee*, 837 F.3d at 537; *see Bueno*, 2025 WL 2719995, at *10 (holding that "loss" of ERISA governance following a PRT does not confer Article III standing); *see also Knudsen*, 117 F.4th at 582 (injury that was not the "but for" result of an ERISA violation did not satisfy Article III).

The magistrate judge, therefore, correctly declined to follow *Doherty v. Bristol-Myers Squibb Co.*, 2025 WL 2774406, at *8 (S.D.N.Y. Sept. 29, 2025), *motion to certify interlocutory appeal granted*, No. 1-24-cv-06628, ECF 101 (S.D.N.Y. Nov. 17, 2025). *See* R&R at 8-9. Apart from ignoring the other problems above, *Doherty* relied heavily on *Ross v. Bank of America, N.A.*, 524 F.3d 217 (2d Cir. 2008), an antitrust case holding only that certain "antitrust harms" related to collusive conduct among credit-card providers satisfied Article III, *id.* at 223-24. But this is not an antitrust case, so it makes little sense to extend *Ross*'s reasoning about antitrust injuries beyond that unique context, as other courts have correctly recognized.[13] This Court instead should follow the logic of *Bueno*, which correctly applied legal principles applicable in the ERISA context to reject the same arguments Plaintiffs advance here. *See* 2025 WL 2719995, at *10; *see also Krauter*, 725 F. App'x at 108 (rejecting standing arguments that were based cases far[] afield" of ERISA).

## II. Plaintiffs Failed to Plead an "Imminent" Injury Under Article III.

Although Plaintiffs spend most of their brief arguing otherwise, their purported standing in this case depends on a *potential future injury*: non-payment of future benefits. But a feared future injury cannot satisfy Article III unless it is "imminent," meaning the future injury is "certainly impending" or poses a "substantial risk" of occurring. *Clapper*, 568 U.S. at 401-02, 414 n.5; *FDA*,

[13] *See, e.g.*, *Jones v. Sears Roebuck & Co.*, 301 F. App'x 276, 284 (4th Cir. Nov. 10, 2008) ("[T]he [p]laintiffs have not alleged antitrust violations or collusion by credit card companies. We thus agree with the [d]efendants that *Ross* does not support the Plaintiffs' argument on standing."); *Sloat through Loudon v. Active Day, Inc.*, 2024 WL 4654161, at *3 (D.S.C. Mar. 28, 2024) (declining to apply *Ross* because "[t]his, of course, is not an antitrust case, and [p]laintiffs provide no authority suggesting an antitrust injury is comparable to the injury [they] claim here.").

602 U.S. at 381 ("imminent" injury must be "likely to occur soon"); *TransUnion*, 594 U.S. at 435 (recognizing same). An "imminent" injury requires "a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all[.]" *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (citations omitted). Thus, a theory of standing that "relies on a highly attenuated chain of possibilities, does not satisfy the requirement that a threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

Plaintiffs offer nothing more than that here. To the contrary, Plaintiffs acknowledge that multiple layers of financial protection would all have to fail before they would lose benefits: (1) Athene's Separate Account; (2) Athene's general account assets; (4) Athene's reinsurance policies; and (4) state insurance guarantees. *See supra* 5; CC ¶¶ 72, 34-35. But Plaintiffs do not plausibly allege that any of these layers of protection will fail, let alone imminently. That leaves Plaintiffs only to speculate that *if* Athene's Separate Account were exhausted, and *if* its general account assets were insufficient to cover Plaintiffs' benefits, and *if* Athene's reinsurance polices were also insufficient, and *if* Plaintiffs' benefits exceed their state insurance guarantees, then they *might* suffer a loss of future pension benefits. Because Plaintiffs "cannot now describe how [they] will be injured in this case without beginning [that] explanation with the word 'if,'" they have not pleaded an imminent injury. *Reilly*, 664 F.3d at 43; ECF 58 at 14-20; ECF 73 at 6-10.

To illustrate, consider the first layer of protection: Athene's Separate Account. Plaintiffs allege that if it were depleted, Athene would need to tap its general account assets, or failing that, its reinsurance policies to cover their benefits. CC ¶ 72. But Plaintiffs never allege that the Separate Account is underfunded or depleting. And public records show that it holds over $51 billion in assets—an amount that exceeds Athene's pension liabilities by over $875 million. *Supra* at 5. With no allegation that the Separate Account is insufficient to cover their future benefits, Plaintiffs have

not plausibly alleged even the first link in the chain of hypothetical events that would have to occur before they would suffer their feared injury. This alone confirms that their future injury theory is far too speculative to satisfy Article III. *See, e.g.*, *Perelman*, 793 F.3d at 368, at *375 ("risk of default [was] entirely speculative"); *Krauter*, 725 F. App'x at 108 (same); *Bueno*, 2025 WL 2719995, at *18 (allegations were too speculative to infer "substantial risk" of default given Separate Account funding and other factors); *Camire*, 2025 WL 947526, at *8 (allegations that "Athene's accounts would need to be underfunded or insufficient to cover participants' losses" confirmed that future injury depended on a "highly attenuated chain of possibilities" and was not "certainly impending" (quoting *Clapper*, 568 U.S. at 410)).

Ignoring the Separate Account, Plaintiffs invoke their allegations about Athene's general account and reinsurance practices. Objs. at 15-16. But while these allegations may suggest Athene is "riskier" than other insurers, they do not plausibly suggest that Athene faces a "substantial risk" of default.[14] If company A has a 0.001% risk of default and company B has a 0.002% risk of default, then company B is twice as risky as company A, but its risk of default is still insubstantial. "Put simply, because Plaintiffs never allege that Athene is substantially likely to fail—just that it is at a greater risk of failure than its competitors—they have failed to establish standing on the basis of an increased risk of harm." *Camire*, 2025 WL 947526, at *7; *Bueno*, 2025 WL 2719995, at *16 ("[T]hat Athene is perhaps more risky than other provider[s] does not suffice to show that there is a *substantial* risk that Athene will fail.").

[14] Numerous fallacies in Plaintiffs' allegations about Athene are detailed elsewhere. ECF 58 at 16-19; ECF 73 at 7-9. For example, drawing from Athene's SEC filings, Plaintiffs declare that Athene invests in "risky" securities. CC ¶¶ 7, 51, 62. But they ignore that these same documents show that over 95% of Athene's general account investment are in the two safest "investment grade" categories. ECF 58 at 17. This is a far cry from the circumstances surrounding the Executive Life collapse (the only example Plaintiffs identify in which annuitants lost benefits) 35 years ago, where 60% the company's investment consisted of *non*-investment grade "junk bonds." CC ¶ 37.

Here again, Plaintiffs' own allegations illustrate the point. Despite Athene's allegedly risky practices, Plaintiffs acknowledge that it has A+/A1 ratings from the agencies (Moody's, Fitch, S&P, AM Best) who specializing in assessing insurance risk. *Supra* at 5-6. Plaintiffs further allege that companies with an "A" rating from Moody's—a notch *below* Athene's "A1" rating—have an expected default rate of only 5% over a "20-year time horizon." *Supra* at 6; CC ¶ 97. Considering that companies with *lower* ratings than Athene only rarely default, it is implausible to infer that Athene nevertheless faces a "substantial risk" of doing so. *See Bueno*, 2025 WL 2719995, at *18 ("The Court has trouble reconciling . . . a five-percent risk of default over a twenty-year period with a finding that [Athene] poses a substantial risk of default in a manner that would imminently prevent Plaintiffs from receiving their annuity payments.").[15]

Plaintiffs chide the magistrate judge for citing the original complaint in the R&R. Objs. 16. But their suggestion that the magistrate judge ignored Plaintiffs' allegations—despite allowing enlarged briefing based on the Consolidated Complaint, allowing Plaintiffs to file a sur-reply and other supplemental briefs, and then actively engaging in hours of oral argument focused on Article III standing—is disingenuous. Not only did the parties' briefs discuss the Consolidated Complaint in detail, but both the parties and the magistrate judge referenced the Consolidated Complaint repeatedly during oral argument. ECF 97, Hr'g Tr. at 4, 9, 16, 19, 24, 58, 59.

In any event, the allegations the magistrate judge supposedly "overlooked" change nothing. Objs. at 16. Specifically, Plaintiffs cite paragraphs 78-88 of the Consolidated Complaint. In those paragraphs, they tried to compare Athene to three domestic insurers and one *foreign* reinsurer that Plaintiffs say "failed" in 2024. ECF 58 at 18-19 (addressing these allegations). But Plaintiffs'

[15] The court in *Bueno* accepted an inaccurate allegation that Athene had an "A" rating from Moody's, suggesting a 5% default rate over a twenty-year horizon, but it is public record that Athene had (and has) a *higher* "A1" rating from Moody's. *See supra* at 5-6.

comparisons are far too generic to suggest that Athene faces an imminent default. Plaintiffs alleged no facts about these companies' financial resources, lines of business, or credit ratings—let alone meaningfully compared them to Athene's. That is because public records confirm that the insurers Plaintiffs identify had vastly inferior resources (million not billions) and credit ratings (Bs and Cs, not A+/A1) than Athene—even before regulators stepped in to rehabilitate the companies. *See id.* Nor do Plaintiffs allege that *any* of these insurers ever failed to pay annuitants or other policy holders. After ATI made these points in its motion to dismiss, *see id.*, Plaintiffs offered no specific response, *see* ECF 61 at 26, so it is unclear what more the magistrate judge needed to say beyond that she agreed with *Bueno*, which squarely rejected Plaintiffs' same allegations. *See* R&R at 12; *Bueno,* 2025 WL 2719995, at *17 (rejecting "allegations regarding a few recent examples of annuity providers that have been the subject of regulatory intervention").[16]

**III. Plaintiffs Cannot Avoid Pleading an Injury by Seeking Equitable Relief.**

The magistrate judge correctly rejected Plaintiffs' final argument that they need not plead a personal injury because they seek equitable relief, including disgorgement, under ERISA. R&R at 10-11; Objs. at 17-19. Not only is Plaintiffs' argument foreclosed by *Thole*, but it is also foreclosed by Third Circuit precedent predating *Thole.*

In *Thole*, the plaintiffs alleged that pension plan fiduciaries both imperiled their pension

[16] The magistrate judge rightly followed the reasoning of *Camire* and *Bueno*, which dismissed materially identical claims on standing grounds, as opposed to *Doherty* and *Konya v. Lockheed Martin Corp.*, 2025 WL 962066 (D. Md. Mar. 28, 2025), *appeal docketed*, No. 25-2061 (4th Cir.), which reached the opposite conclusion. R&R at 8-12. The first two cases appropriately followed the logic of *Thole* and *Clapper*, and reached conclusions that are consistent with Third Circuit decisions, including *Perelman*, *Krauter*, and *Reilly*. The same cannot be said for *Doherty*, which credited a mere increased risk of future injury as sufficient on its own to satisfy Article III. The *Konya* court similarly erred in concluding that the plaintiffs there had barely "eked out" Article III standing. *See* ECF 85-1 at 5 (discussing *Konya*). And critically, unlike here, the *Konya* complaint made no mention of Athene's separate account or the other layers of protection that would have to fail before plaintiffs would lose any benefits, so the court did not consider them. *Id.*

benefits and profited personally from the misuse of plan assets. 590 U.S. at 541, 545. As a remedy, the plaintiffs sought equitable relief, including "disgorgement of ill-gotten profits and fees, removal of the disloyal fiduciaries, and an injunction to stop the ongoing breaches." *Thole*, 590 U.S. at 551 (Sotomayor, J., dissenting). The plaintiffs argued that, under long-standing trust law principles, they did not need to plead a personal injury to have standing to seek such relief. *Id.* at 542. However, the Supreme Court rejected this "trust-based theory of standing," because, unlike trust beneficiaries, defined-benefit plan participants have no "equitable or property interest" in the plan or plan assets used to fund benefits, and thus have no Article III standing to seek disgorgement of profits or other equitable relief based on the alleged misuse of those assets. *Id.* at 542-43.

The same analysis applies here. Like the plaintiffs in *Thole*, Plaintiffs claim Defendants imperiled their pension benefits and personally profited based on their misuse of "the *Plan's assets* to purchase the Athene annuities." ECF 61 at 39 n.11 (emphasis in original). But because Plaintiffs have no legal interest in the Plan's assets—and thus no entitlement to profits allegedly derived from their misuse—they have no Article III standing, unless they can show that they suffered an actual or imminent loss of promised benefits. *See* R&R at 11; *Thole*, 590 U.S. at 543; *Perelman*, 793 F.3d at 374. As already discussed, Plaintiffs have done neither.

Undeterred, Plaintiffs argue that a *non-pension plan* case decided seven years before *Thole* "controls" the analysis. Objs. 18 (citing *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406 (3d Cir. 2013)). Plaintiffs are wrong. In *Edmonson*, the Third Circuit held that a widowed *life-insurance* beneficiary had standing to sue an insurance company who deposited the beneficiary's death benefits into an interest-bearing account for her personal use, but then invested that money and pocketed the net profits. 725 F.3d at 411-12. In those unique circumstances, the Third Circuit held that the beneficiary had an "individual right" to the profits the insurer obtained by using

money it appropriated from her personal account. *Id.* at 417. But four years later, the Third Circuit reached the *opposite* conclusion in *Perelman*, where, as here, a *defined-benefit plan* plaintiff sought to disgorge "profits" plan fiduciaries had allegedly derived through their alleged misuse of plan assets. 793 F.3d at 374-75. The deciding factor was that while the death benefits in *Edmonson* "belonged to" the plaintiff, 725 F.3d at 417, the plan assets in *Perelman* did *not* belong to the plaintiff, 793 F.3d at 374. Thus, the plaintiff in *Perelman* had no "individual right to the defendant's profit," and thus no Article III standing to disgorge it. *Id.* at 375.

Given this backdrop, Plaintiffs' argument plainly fails. To the extent *Edmonson* or *Perelman* can be interpreted to hold, as Plaintiffs incorrectly suggest, that pension plan participants have Article III standing to disgorge profits or seek other equitable relief, even in the absence of an actual or imminent benefit loss, those decisions are contradicted, and thus abrogated, by *Thole*. But even setting aside that problem, Plaintiffs' argument would still fail because, as in *Perelman*, they have no entitlement to profits allegedly obtained through the use of "the *Plan's assets* to purchase the Athene Annuities." ECF 61 at 39 n.11; R&R at 11.[17]

**CONCLUSION**

For all of the above reasons and those discussed in ATI's motion to dismiss briefing, the Court should adopt the magistrate judge's recommendation and dismiss the Consolidated Complaint on standing grounds.

---

[17] Plaintiffs' citation to *Peters v. Aetna, Inc.*, 2 F.4th 199 (4th Cir. 2021), is misplaced. Objs. at 19. First, the reasoning Plaintiffs cite from *Peters* is not binding on this Court, and, because it is *dicta*, is not binding anywhere. Second, the claims in *Peters* did *not involve a pension plan*, which explains why the court *never mentioned Thole* in its opinion. And third, while *Konya* relied on the *dicta* in *Peters*, that decision is subject to a pending appeal. *See Konya*, No. 25-2061 (4th Cir.).

Respectfully submitted this 19th day of November 2025.

*/s/ Christopher J. Boran*
Christopher J. Boran* (IL 6282552)
MORGAN, LEWIS & BOCKIUS LLP
110 N. Wacker Drive, Suite 2800
Chicago, IL 60606-1511
T. 312.324.1146
F. 312.324.1001
christopher.boran@morganlewis.com

Jeremy P. Blumenfeld* (PA 85955)
Jared R. Killeen* (PA 330123)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
T. 215.963.5000
F. 215.963.5001
jeremy.blumenfeld@morganlewis.com
jared.killeen@morganlewis.com

Alexa Beining (PA 330371)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, Floor 32
Pittsburgh, PA 15219-6401
T. 412.560.7014
F. 412.560.7001
alexa.beining@morganlewis.com

*admitted *pro hac vice*

*Counsel for Defendants ATI Inc. and the Allegheny Technologies Incorporated Plan Administrative Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to counsel of record.

*/s/ Christopher J. Boran*
Christopher J. Boran