**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM L. SCHOEN, *et al.*,<br>Plaintiffs<br>v.<br>ATI INC., *et al.*,<br>Defendants | Civil Action No. 2:24-cv-01109-NR-KT<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR OBJECTIONS TO THE REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The loss of value to Plaintiffs' retirement benefits satisfies Article III. ........ 2

A. *Thole* does not preclude standing ........ 3

B. Defendants' unsupported "no-market, no-standing" theory is incorrect ........ 5

II. Plaintiffs have suffered injury under *TransUnion* ........ 6

A. Plaintiffs satisfy *TransUnion*'s first prong ........ 7

B. Plaintiffs satisfy *TransUnion*'s second prong, as well ........ 8

III. Plaintiffs' loss of ERISA protections is a separate Article III injury ........ 10

IV. Plaintiffs plausibly allege future injury ........ 11

A. Defendants' "multiple-layers" argument ignores Plaintiffs' factual allegations and assumes the truth of cherry-picked, untested extrinsic materials. ........ 11

B. Athene's illusory credit rating does not negate its substantial risk of default ........ 15

C. Defendants' argument about Plaintiffs' overlooked allegations is unpersuasive ........ 16

V. Even without all these additional Article III injuries, Plaintiffs would have standing to seek disgorgement. ........ 17

VI. This Court should not follow either *Camire* or *Bueno* ........ 19

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## CASES

*Beck v. PACE Int'l. Un.*,
551 U.S. 96 (2007) ........ 7

*Bueno v. Gen. Elect. Co.*,
No. 1:24-cv-0822, 2025 WL 2719995 (N.D.N.Y. Sept. 24, 2025) ........ 19

*Camire v. Alcoa USA Corp.*,
No. 24-1062, 2025 WL 947526 (D.D.C. Mar. 28, 2025) ........ 19

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) ........ 11

*Cook v. Gamestop, Inc.*,
148 F.4th 153 (3d Cir. 2025) ........ 7

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013) ........ 4

*Davoue v. Fanning*,
2 Johns. Ch. 252 (N.Y. Ch. 1816) ........ 18

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ........ 10, 11

*Doherty v. Bristol-Myers Squibb Co.*,
No. 24-CV-006628, 2025 WL 2774406
(S.D.N.Y. Sept. 29, 2025) ........ 2, 3, 4, 10, 11, 13, 14, 15, 16, 19

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013) ........ 1, 17, 18

*Gollust v. Mendell*,
501 U.S. 115 (1991) ........ 6

*Knudsen v. MetLife Grp., Inc.*,
17 F.4th 570 (3d Cir. 2024) ........ 11

*Konya v. Lockheed Martin Corp.*,
No. 24-750-BAH, 2025 WL 962066 (D. Md. Mar. 28, 2025) ........ 2, 11, 12, 13, 19

*Krauter v. Siemens Corp.*,
725 F. App'x 102 (3d Cir. Feb. 16, 2018) ........ 5

*Lee v. Verizon Commc'ns, Inc.*,
837 F.3d 523 (5th Cir. 2016) .......... 4

*Liberty Mut. Fire Ins. Co. v. Michael Baker Int'l. Inc.*,
No. 2:19-cv-00881-JNP-DAO, 2022 WL 1568923 (D. Utah May 18, 2022) .......... 14

*Lujan v. Def's. of Wildlife*,
504 U.S. 555 (1992) .......... 13

*Michoud v. Girod*,
45 U.S. 503 (1846) .......... 18

*Nat'l. Pork Prods. Council v. Ross*,
598 U.S. 356 (2023) .......... 3

*Pender v. Bank of Am. Corp.*,
788 F.3d 354 (4th Cir. 2015) .......... 18

*Perelman v. Perelman*,
793 F.3d 368 (3d Cir. 2015) .......... 4, 18

*Peters v. Aetna*,
2 F.4th 199 (4th Cir. 2021) .......... 17

*Piercy v. AT&T Inc.*,
No. 24-10608-NMG, 2025 WL 2809008 (D. Mass. Sept. 30, 2025) .......... 2, 3, 5, 13, 19

*Piercy v. AT&T Inc.*,
No. 24-cv-10608-NMG, 2025 WL 2505660 (D. Mass. Aug. 29, 2025) .......... 2, 3, 4, 5, 12

*Ross v. Bank of Am., N.A.*,
524 F.3d 217 (2d Cir. 2008) .......... 10

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) .......... 12

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*,
181 F.3d 410 (3d Cir. 1999) .......... 12

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) .......... 12

*Spokeo Inc. v. Robins*,
578 U.S. 330 (2016) .......... 8, 9, 10

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020) .......... 1, 3, 4, 5, 6, 9, 10, 18, 19

*Toll Brothers Inc. v. Township of Readington*,
555 F.3d 131 (3d Cir. 2009) ........................................ 6

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................ 1, 5, 6, 7, 8, 9, 10, 18, 19

**STATUTES**

29 U.S.C. § 1104........................................ 7

29 U.S.C. § 1132........................................ 7, 8, 9, 15, 17

**OTHER AUTHORITIES**

139 Cong. Rec. S 9874 (July 29, 1993) ........................................ 9

*Court Decisions Affecting ERISA and Executive Life Annuities: Hr'g on S.1312*,
1993 WL 760178 (Aug. 2, 1993)........................................ 15

*Restatement (Third) of Agency*
§ 8.01 cmt. d(1)–(2) (2006) ........................................ 18

**RULES**

Fed. R. Civ. P. 12(b)(1)........................................ 19

**REGULATIONS**

29 C.F.R. § 2509.95-1........................................ 15

## INTRODUCTION

Defendants say Plaintiffs "mak[e] standing law more complicated than it needs to be." ECF No. 103 ("Resp.") at 7 (quotation omitted). But Plaintiffs' standing is simple: the Athene transaction reduced the present value of their retirement benefits. Defendants do not dispute that Plaintiffs suffered this loss. Nor could they. Plaintiffs' Athene annuities are worth far less than the ATI-guaranteed, federally insured pensions they once had. This economic loss satisfies Article III. Defendants' contrary view ignores common sense, defies precedent, and relies on a misreading of *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020)—a misreading persuasively rejected by multiple courts. ECF No. 101 ("Pls.' Objs") at 12–13.[1]

To prevail Defendants must also refute Plaintiffs' four additional bases for standing. But they cannot undermine even one. ***First***, Plaintiffs have standing under *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422–33 (2021), because (i) their harm is the same as that arising when a contractual duty is delegated to someone less reliable, and (ii) Congress has recognized that Plaintiffs have already suffered actionable harm. ***Second***, Defendants do not dispute that by executing the Athene transaction they stripped Plaintiffs of numerous, valuable legal protections—a different Article III injury, not at issue in *Thole*. ***Third***, Plaintiffs plausibly allege a "substantial risk" of future injury (which Defendants concede is the benchmark), a point underscored by Defendants' inability to respond without ignoring Plaintiffs' factual allegations; imploring this Court to draw inferences in their favor; and relying on the truth of untested "facts" not properly before the Court. ***Fourth***, even setting this all aside, Plaintiffs have standing under *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013). Defendants do not dispute *Edmonson*'s conditions are met, and *Edmonson* remains good law.

---

[1] Page numbers refer to ECF-generated pagination.

Defendants' standing challenge must be rejected, as the better-reasoned decisions hold. *Doherty v. Bristol-Myers Squibb Co.*, No. 24-CV-006628 (MMG), 2025 WL 2774406 (S.D.N.Y. Sept. 29, 2025) (rejecting identical standing challenge); *Piercy v. AT&T Inc.*, No. 24-cv-10608-NMG, 2025 WL 2505660 (D. Mass. Aug. 29, 2025) ("*Piercy R&R*") (same); *Piercy v. AT&T Inc.*, No. 24-10608-NMG, 2025 WL 2809008 (D. Mass. Sept. 30, 2025) ("*Piercy*") (same); *Konya v. Lockheed Martin Corp.*, No. 24-750-BAH, 2025 WL 962066 (D. Md. Mar. 28, 2025) (same).

**ARGUMENT**

**I. The loss of value to Plaintiffs' retirement benefits satisfies Article III.**

Defendants cannot dispute that the value of any stream of payments, including retirement benefits, depends not only on their nominal amount but also their security (*i.e.*, the risk of nonpayment)—which is why a promise of $1,000/month from Charles Ponzi is worth far less than the promise of $1,000/month from the federal government. Pls.' Objs. 10 & n.4; *Piercy R&R*, 2025 WL 2505660, at *7 ("[G]radients of risk are a staple of the world's financial markets. It would be ridiculous to suppose that the pricing of bonds (which are, like annuities, long-term promises to provide a stream of payments) could be based on a simple binary: whether the debtor has, or has not, missed any payments."). Defendants thus cannot dispute that Plaintiffs' Athene annuities are less "financially valuable" than their now-dissolved pensions. *Doherty*, 2025 WL 2774406, at *7; *see Piercy R&R*, 2025 WL 2505660, at *12; *Compare* Pls.' Objs. 10–11, *with* Resp. 13–15.

That loss of value satisfies Article III. *Doherty*, 2025 WL 2774406, at *7 (concluding this alleged "diminution in value represents a tangible economic injury" that satisfies Article III); *Piercy R&R*, 2025 WL 2505660, at *8 ("Defendants ignore the basic economic reality that concrete, measurable, compensable harms may attend an increased risk of failure, even when such failure is not 'imminent'"); Pls.' Objs. 10–11 & n.5 (identifying precedent holding that a loss of

economic value satisfies Article III even absent a realized loss). Defendants' two counterarguments are unpersuasive.

### A. *Thole* does not preclude standing.

Defendants' interpretation of *Thole* has been decisively refuted. *Piercy R&R*, 2025 WL 2502660, at *7; *Doherty*, 2025 WL 2774406, at *9; Pls.' Objs. 12–13. They nowhere grapple with the key factual difference between *Thole* and this case: the *Thole* plaintiffs lacked standing because regardless of whether the *plan* lost assets, their rights to federally insured, employer-backed *pensions* were unchanged. 590 U.S. at 540–45.

*Piercy* nailed this point, explaining that Defendants' interpretation of *Thole* depends on "wresting" language "from its context" and "bury[ing] the critical point": "[I]n *Thole* the plaintiffs were 'legally and contractually entitled to receive' their payments from the same set of payors and guarantors, regardless of the outcome of that case. In this case, by contrast, the dispute is about the substitution of different payors and guarantors. Plainly that can make a big difference." 2025 WL 2505660, at *7 (quoting *Thole*). And as Judge Garnett persuasively explained in *Doherty*, *Thole* "addressed facts highly distinct from those in this case" and was "starkly different" because (i) the *Thole* fiduciaries "did not do anything that affected the nature of the plaintiffs' entitlements" or "jeopardize[]" those benefits "in any tangible way"; (ii) "Plaintiffs do not enjoy any of the safeguards that *Thole* discussed" because they were "ejected from ERISA" and "there is no more retirement plan"; and (iii) "Plaintiffs advance an entirely different theory of injury than the one *Thole* confronted and ruled on." 2025 WL 2774406, at *9. Defendants' error is classic: they "parse[]" *Thole* "as though we were dealing with the language of a statute," rather than an opinion that resolved a "discrete case[]" and "must be read with a careful eye to context." *Nat'l. Pork Prods. Council v. Ross*, 598 U.S. 356, 373–74 (2023) (quotation omitted).

Indeed, Defendants cannot analogize to *Thole* without mischaracterizing the facts here. They write: "As in *Thole*, Plaintiffs have admittedly received all of their monthly *pension benefits* from Athene, and they remain legally entitled to those *same* benefits for life under the applicable annuity contracts." Resp. 12–13 (emphases added). Every part of that is wrong. Plaintiffs no longer have *any* "pension benefits," and the benefits they do have are not the "same" as they were before the transaction. *See Piercy R&*R, 2025 WL 2505660, at *7; *Doherty*, 2025 WL 2774406, at *8–9. To contend otherwise ignores the factual allegations and presumes what Defendants cannot defend—that a promise of a specific sum from Charles Ponzi is the "same" as the promise of that sum from the government. *Piercy R&R*, 2025 WL 2505660, at *7 (an "I.O.U. from a reputable bank" is "obviously more valuable" than "an I.O.U. from one's impecunious cousin"); *id.* ("Defendants' focus on the fact that no payments have yet been missed ignores the fundamental financial concept of counterparty risk"); *Doherty*, 2025 WL 2774406, at *9 ("Beneficiaries who will rely on their retirement benefits to support them through their senior years of course have a strong interest in not only the *amount* of their monthly benefits but also [their] *security*.").

None of the decisions Defendants cite (Resp. 13) to support their reading of *Thole* helps them. *See Piercy R&R*, 2025 WL 2505660, at *8 (rejecting defendants' reliance on decisions that "deal with potential harms to pension *plans*, resulting from improvident financial decisions" because "[t]hose cases do not even purport to address the prospect that beneficiaries may be injured if they are relegated to unduly risky annuities"). Like *Thole*, neither *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015), nor *David v. Alphin*, 704 F.3d 327, 336–38 (4th Cir. 2013), involved plaintiffs whose pensions were transformed into less-valuable annuities, or who were ejected from ERISA. And *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523 (5th Cir. 2016), backfires

on Defendants: that case involved *two* classes of plaintiffs, and *no one disputed* that the plaintiffs in the same position as Plaintiffs here had standing. *See* ECF No. 61 ("Pls.' Opp.") at 33.[2]

**B. Defendants' unsupported "no-market, no-standing" theory is incorrect.**

Defendants say this Court must ignore the lost value of Plaintiffs' retirement benefits because Plaintiffs could not sell their pensions (or the annuities they have been replaced with) on a market. Resp. 15. But that argument has also been refuted. *Piercy R&R*, 2025 WL 2505660, at *12; *Piercy*, 2025 WL 2809008, at *1.

Defendants *still* have identified no case holding that a plaintiff lacks Article III injury unless he can sell his infringed interest on a market. That is because none exists. *See Thole*, 590 U.S. at 540–47 (nowhere suggesting the plaintiffs lacked standing because their pensions were non-transferable); *TransUnion*, 594 U.S at 424–41 (nowhere suggesting transferability of the plaintiff's infringed interest has anything to do with Article III injury). And Defendants cannot dispute that Plaintiffs will be able to measure their loss of value, even without a market for pensions in which they can participate. Pls.' Objs. 14 n.8; Pls.' Opp. 39 n. 7; *Piercy R&R*, 2025 WL 2505660, at *12 ("[T]he value of a financial instrument (transferable or not) does not necessarily depend on whether the instrument is readily marketable, or even marketable at all."). Defendants have no answer to the points that identical streams of retirement income are valued every day; that such valuations are *required* by ERISA; and that Defendants and Athene *themselves* measured Plaintiffs' loss. Pls.' Objs. 14 n.8. And what is Defendants' response to the essential point, *id.*, that it defies logic to say Plaintiffs lack *any* injury when their injury is *quantifiable*? More silence.

---

[2] Defendants' unpublished opinion, *Krauter v. Siemens Corp.*, 725 F. App'x 102, 106–08 (3d Cir. Feb. 16, 2018), is also irrelevant and did not even involve the plaintiff's ejection from ERISA or the transformation of pensions into annuities. The R&R correctly disregarded it.

At bottom, Defendants' "no-market, no-standing" theory is an attempt to sidestep the precedent holding that lost value to one's financial interest satisfies Article III. *Compare id.* at 10–11, *with* Resp. 15 & n.9. But *none* of Plaintiffs' loss-of-value precedents turned on whether the impaired financial interest could be sold. Consider *Toll Brothers Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009), which the Response neglects. The plaintiff challenged a zoning ordinance that "decreased the value" of its unexercised option to buy a parcel at a specific price. *Id.* at 142. The plaintiff had standing because even though it lacked a "present interest" in the parcel, it had an interest in its option, which had lost value because of the unlawful act. *Id.* at 141–42 ("By driving down the value of the [parcel], the [defendant] has also driven down the value of [the plaintiff's] option"—a "classic form of economic injury."). The Third Circuit's analysis did not turn on whether the plaintiff's option was transferable, and the court did not ask whether the terms of the option restricted its transfer—an inquiry no authority says is relevant to Article III standing. Yet according to Defendants, transferability makes all the difference: in their view, the *Toll Brothers* plaintiff's federal constitutional standing would have evaporated if the option could not be transfered. That is not the law.[3]

## II. Plaintiffs have suffered injury under *TransUnion*.

Defendants do not defend the R&R's failure to reference, much less apply, *TransUnion*'s two-part test. *Compare* Pls.' Objs. 15, *with* Resp. 16–18. Plaintiffs satisfy that test because (A) their harm is at least closely related to the harm from a party's delegation of its contractual

[3] Defendants' characterization of *Gollust v. Mendell*, 501 U.S. 115 (1991), as exclusively a "*statutory standing*" case, is incorrect. *Gollust* (which *Thole* favorably cited, *as an Article III case*) analyzed Article III doctrine as the basis for its statutory analysis and turned on the conclusion that the diminished creditworthiness of a company is an injury to its shareholders. *Id.* at 125–27. *Gollust* recognized the plaintiff's statutory *and* constitutional standing. *Id.* And several cases (before and after) reiterate the key point: Article III is satisfied when the defendant's unlawful conduct reduces the value of the plaintiff's financial interest. *See* Pls.' Objs. 10–11.

duties to someone far less reliable (in fact, the harms are the same); and (B) Congress has concluded that Plaintiffs have been injured and may sue before default. Pls.' Objs. 15–18.

### A. Plaintiffs satisfy *TransUnion*'s first prong.

Defendants two arguments regarding *TransUnion*'s first prong are weak. ***First***, Defendants say Plaintiffs have suffered no harm analogous to an unlawful, risky contract delegation because "both ERISA and the Plan *expressly permit* transfering responsibility for paying Plaintiffs' benefits to an insurer." Resp. 17. But Defendants ignore that ERISA requires fiduciaries to use plan assets solely for the benefit of participants and prohibits them from transfering the responsibility to pay benefits to risky insurers. Pls.' Opp. 14–15; 29 U.S.C. §§ 1104, 1132(a)(9); *Beck v. PACE Int'l. Un.*, 551 U.S. 96, 102 (2007). And when Defendants say "[t]here is no contractual term barring such 'delegations,'" and that Plaintiffs did not have "any contractual right to have their benefits paid only by ATI," Resp. 17, they treat *TransUnion*'s first prong—asking whether the plaintiff has suffered a *harm analogous* to one traditionally actionable—as though it asks whether the plaintiff is asserting a *claim identical* to one traditionally actionable.

Plaintiffs are *not* asserting a contract claim; rather, they contend their injury is at least "closely related" to the recognized injury from delegating a contractual duty to someone far less reliable. Pls.' Objs. 16 & n.11. That is all *TransUnion* requires. 594 U.S. at 424–25, 432–33; *Cook v. Gamestop, Inc.*, 148 F.4th 153, 162 (3d Cir. 2025) (inquiry concerns the "kind of harm" suffered). If Defendants had their way, the standing of the *TransUnion* plaintiffs (who asserted claims under the Fair Credit Reporting Act and analogized their harm to that caused by defamation) would have turned on whether they actually had defamation claims. That is wrong. *TransUnion*, 594 U.S. at 432.[4]

---

[4] Defendants do not dispute that a party has Article III standing to sue a counterparty for unlawfully delegating a contractual duty. For good reason. Contractual limitations on delegations of duties

***Second***, Defendants misunderstand *TransUnion* when they say that, "even accepting [the] contract analogy," Plaintiffs must show *something else*—"that the transfer of their contractual rights *concretely* harmed them in some way." Resp. 17 (quotation omitted). The whole point of *TransUnion*'s analogy inquiry is to assess an injury's concreteness. 594 U.S. at 417–25 ("Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."). So, where (as here) *TransUnion*'s analogy inquiry is satisfied, an injury is necessarily "concrete" and nothing more is necessary. *Id.* at 432–33.[5]

**B. Plaintiffs satisfy *TransUnion*'s second prong, as well.**

Congress's judgment plays an "important role[]" in "determining whether an intangible harm constitutes injury in fact" because it is "well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo Inc. v. Robins*, 578 U.S. 330, 340–41 (2016); *TransUnion*, 594 U.S. at 425 (Congress's judgment "must" be afforded "due respect"). The parties agree that Congress gave retirees whose pensions are transformed into risky annuities a statutory right to sue the moment that transformation occurs. Pls.' Objs. 17; ECF No. 58 ("ATI Mot.") at 41 (conceding that Section 1132(a)(9) "describes Plaintiffs"). And Defendants do not argue that Congress's judgment that Plaintiffs may sue now was an improper attempt to "us[e] its lawmaking

---

are valid and common. Pls.' Opp. 28–30. And their breach has always been actionable. *Id.*; *Spokeo, Inc. v Robins*, 578 U.S. 330, 344 (2016) (Thomas, J., concurring) (explaining that "common-law courts possessed broad power to adjudicate suits involving the alleged violation of private rights," such as "property" and "contract rights," "even when plaintiffs alleged only the violation of those rights and nothing more").

[5] Defendants mistakenly say they are helped by the part of *TransUnion* rejecting the standing of plaintiffs whose credit files were not disseminated. Resp. 16–17. But those plaintiffs lacked standing because without that dissemination their defamation analogy disintegrated, and (unlike here) they (a) suffered no economic loss; (b) were not deprived of legal protections; and (c) could not "factually establish" a substantial risk of future harm. *TransUnion*, 594 U.S. at 433–38.

power to transform something that is not remotely harmful into something that is" or that the impairment of one's retirement benefits is a "bare procedural violation." *TransUnion*, 594 U.S. at 426, 440. (Nor could they. Plaintiffs have an obvious interest in the security of their benefits and in returning to the position they were in before the transaction.)

Defendants' two arguments about *TransUnion*'s second prong are lackluster. ***First***, Plaintiffs do not contend that having a statutory right of action is always enough to satisfy Article III. *See* Resp. 18. Rather, Plaintiffs contend that Congress's judgment—that retirees may sue when the security of their benefits is impaired, before they lose the checks that will pay for their food, heat, and shelter—matters. *TransUnion*, 594 U.S. at 425–26; *Spokeo*, 578 U.S. at 340–41. ***Second***, Defendants' resort to legislative history is flimsy. Resp. 18 n.12 (asserting that it is unclear what the Congress that enacted Section 1132(a)(9) "believed"). But what is relevant is Congress's judgment expressed in law—not speculation about its *beliefs*. *TransUnion*, 594 U.S. at 425; 29 U.S.C. § 1132(a)(9) (retirees may sue upon "purchase" of the annuities to "assure receipt" of amounts "provided *or to be provided*," including by obtaining prophylactic relief, such as "posting of security") (emphasis added). In any event, Defendants get the legislative history wrong.[6] Congress's judgment, supported by the legislative history and common sense, is clear: Plaintiffs suffer actionable harm when the security of their retirement benefits is impaired—they need not wait for missed checks before commencing the yearslong process of obtaining judicial relief.[7]

[6] The law was intended to "make[] clear that in cases where a pension plan fiduciary purchases insurance annuities in violation of ERISA, the Court may award appropriate relief, including the purchase of a back-up annuity." 139 Cong. Rec. S 9874, 9874 (July 29, 1993). A *back-up* annuity could of course exist only where the original annuity has not yet failed.

[7] *Thole* does not support ignoring Congress's judgment. Resp. 18. Unlike here, where Section 1132(a)(9) addresses Plaintiffs' precise circumstances and recognizes their injury, *Thole* involved a "general cause of action" that did not speak directly to the plaintiffs' circumstances or whether their harm was actionable. 590 U.S. at 544. And that cause of action did not "automatically" confer standing because there were no other indicia of concrete injury. 590 U.S. at 544 (quotation

**III. Plaintiffs' loss of ERISA protections is a separate Article III injury.**

Defendants do not dispute the Athene transaction stripped Plaintiffs of numerous legal protections and benefits they had before the transaction. *Compare* Pls.' Objs. 18–19, *with* Resp. 18–19. And Defendants do not contest that such a deprivation may satisfy Article III. Rather, they say this loss is irrelevant because ERISA "expressly permits" annuity transactions and the decision to engage in such a transaction is a non-fiduciary act. Resp. 18. Defendants equivocate on whether this is an injury-in-fact or causation argument. *Id.* at 18–19. But either way, it is wrong.

If the argument is meant to address injury-in-fact, it "conflates" Article III standing with the merits. *Doherty*, 2025 WL 2774406, at *10. ERISA imposes strict fiduciary obligations on Defendants for their selection of annuity providers, and they must select a provider in the plan participants' best interest. *Id.* at *10. That is what Plaintiffs allege did not happen here. ECF No. 45-2 ("Compl.") ¶¶ 109–40 & Count I. Those allegations must be assumed true. Pls.' Opp. 22. It is irrelevant to injury-in-fact that Defendants could have—hypothetically—executed an annuity transaction with a safe insurer whose selection was lawful.[8]

Defendants' argument fares no better if it concerns causation. Article III requires only a harm "fairly traceable to the defendant's challenged behavior"—a standard requiring "no more than *de facto* causality." *Dep't of Commerce v. New York*, 588 U.S. 752, 766 (2019). Plaintiffs easily satisfy that standard because it is undisputed that their loss of ERISA protections flowed

---

omitted). *Thole* is thus consistent with *TransUnion* and *Spokeo*, decisions issued by the same Court (within five years) that built on one another. And even if there were any inconsistency between *Thole* and *TransUnion*/*Spokeo*, that would favor Plaintiffs because *TransUnion* postdated *Thole*.

[8] Defendants cannot distinguish *Ross v. Bank of Am., N.A.*, 524 F.3d 217 (2d Cir. 2008), on the ground that it is an "antitrust case." Resp. 19. *Ross* rendered an *Article III* holding that plaintiffs suffered injury when the defendant's unlawful conduct forced them to litigate any future claims in a less favorable forum. 524 F.3d at 224–25 (*declining* to analyze "antitrust standing"); *see Thole*, 590 U.S. at 547 ("There is no ERISA exception to Article III."). And Plaintiffs' injuries here are *greater* than that which sufficed in *Ross*. Pls.' Objs. 18–19; *Doherty*, 2025 WL 2774406, at *8–9.

directly from Defendants' "challenged behavior," *id.*—using Plan assets to purchase annuities from Athene. Nothing supports Defendants' view that an Article III injury does not "count" simply because a similar injury might have accrued if Defendants had (purely hypothetically) obeyed the law. Counterfactuals count for nothing when it comes to Article III causation.[9]

## IV. Plaintiffs plausibly allege future injury.

Defendants agree a future injury suffices if there is a "substantial risk" it will occur. Resp. 14 (quotation omitted). Assuming Plaintiffs' allegations are true and drawing reasonable inferences in their favor, as this Court must, Plaintiffs clear that bar. *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152–53 (3d Cir. 2022) ("substantial risk" satisfied by a "realistic danger of sustaining a direct injury") (quotation omitted); *Doherty*, 2025 WL 2774406, at *5 (plaintiffs plausibly alleged substantial risk); *Konya*, 2025 WL 962066, at *6–13 (same). For example, Plaintiffs allege that an independent study incorporated in the Complaint found, using objective market measures, that Athene's "default risk" is *14–21%*. Compl. ¶¶ 89–90 & n.2.[10] By any standard, that "likelihood of default," NISA Study 7, (roughly the same likelihood as losing at Russian roulette) is a "substantial risk" and "realistic danger" of injury, *Clemens*, 48 F.4th at 152–53.

### A. Defendants' "multiple-layers" argument ignores Plaintiffs' factual allegations and assumes the truth of cherry-picked, untested extrinsic materials.

Defendants say Plaintiffs' factual allegations about Athene's practices do not suffice because "multiple layers of financial protection" would have to fail "before [Plaintiffs] would lose

---

[9] Defendants' inaccurate citation to *Knudsen v. MetLife Grp., Inc.*, 17 F.4th 570, 582 (3d Cir. 2024), says it all. *Compare Knudsen*, 17 F.4th at 582 (Article III causation requires only a but-for connection between the injury and "the defendant's challenged action" or "conduct"), *with* Resp. 19 (writing around that language).

[10] https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/#_ftnref7 (hereafter, "NISA Study"). Page references to the NISA Study correspond to the pdf available for download at the above-referenced address.

benefits." Resp. 20. That is false, and Defendants can make this argument only by ignoring Plaintiffs' factual allegations and treating as gospel documents not properly before the Court on this "facial," ATI Mot. 16, motion to dismiss.

***First***, Defendants say Athene's so-called "separate account" impairs Plaintiffs' standing because it has "over $51 billion in assets." Resp. 20. But Defendants' basis for that assertion (obscured by internal cross-referencing) is *Athene's own financial statements*, the accuracy of which has not been tested by the adversarial process. And although the Court may take "judicial notice" of the "existence" of Athene's filings, it cannot assume "the truth of the facts recited therein." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (same).[11]

Worse still, Defendants say *Plaintiffs* "[i]gnore the Separate Account," Resp. 21, when in fact *Defendants* ignore Plaintiffs' factual allegations about that account, Compl. ¶ 75. Plaintiffs allege Athene's so-called "separate account" is *not* separate because it is not "truly 'ring-fenced' or insulated from Athene's general liabilities"; that the account may be used to support Athene's obligations unrelated to Plaintiffs; and that under certain conditions Athene may "withdraw assets from the separate account and transfer them to its general account." *Id.* Further, as the incorporated

[11] Plaintiffs explained this distinction from the outset. Pls.' Opp. 24. Defendants continue to elide it. Resp. 10 n.5. And their lone authority proves Plaintiffs' point. *Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014), was a statute-of-limitations case concerning a plaintiff's *notice* of representations made in public filings. It did not hold that a defendant may assume the truth of the contents of extrinsic documents to attack the plaintiff's allegations and inferences. And the court held that affidavits "clearly" could *not* be considered on the pleadings. *Id.* at 249. Here, Defendants attempt to use Athene's filings like an affidavit—to smuggle facts into the case now (without challenge) that they can present later (subject to adversarial testing). Other courts have rejected that effort. *Piercy R&R*, 2025 WL 2505660, at *38 n. 27 (rejecting defendants' use of extrinsic materials to prop up Athene because "it is one thing" to take notice "that a corporation has publicly filed its financial statements" and "another thing altogether to conclude that the figures reported are themselves accurate"); *Konya*, 2025 WL 962066, at *13 (similar).

NISA Study explains (at 6–7), even a truly separate account would not negate Plaintiffs' risk because the account's assets are likely no safer than those in the insurer's general account.[12]

The key point is that Athene's own outside-the-record assertions about the value of its assets cannot be assumed true on this facial standing challenge, especially given Plaintiffs' allegations (which Defendants ignore) that Athene has loaded up on illiquid and volatile assets whose value and liquidity is overstated. Compl. ¶¶ 49, 51, 64. Defendants may not defeat standing by substituting their own improper factual assertions for the Complaint's detailed factual allegations and reasonable inferences. *Doherty*, 2025 WL 2774406, at *6 & n.7 (rejecting defendants' "separate account" argument and ignoring their extrinsic material because it "[sought] to introduce new facts to controvert the conclusion [Plaintiffs'] factual allegations are intended to support, *i.e.*, that Athene is at substantial risk of default"); *Konya*, 2025 WL 962066, at *13 (same result because "Plaintiffs have had no meaningful opportunity to evaluate and challenge Lockheed's implied assertion that these 'separate accounts' obviate the risk").[13]

***Second***, Defendants' assertion that state guaranty associations ("SGAs") are another "layer[] of financial protection" that must fail before Plaintiffs "lose benefits," Resp. 15, is also

---

[12] Since filing the Complaint, Plaintiffs have uncovered further facts establishing that Athene's so-called "separate" account is not separate and cannot reduce, let alone eliminate, Athene's substantial risk, including because Athene "simply place[s] the much riskier assets of its general account" into its so-called "separate account." *See, e.g.*, *Piercy*, 1:24-cv-10608-NMG, ECF No. 146 ¶¶ 152–63 (filed Oct. 29, 2025). Plaintiffs could amend the Complaint here to include such facts. But there is no need. They have pled a "case or controversy" many times over, and the proper theater for litigating factual disputes about Athene's inner workings is not a facial standing attack, but discovery, summary judgment, and trial. *Lujan v. Def's. of Wildlife*, 504 U.S. 555, 561 (1992).

[13] Defendants have never explained why they brought a "facial" standing challenge and then relied on a smorgasbord of extrinsic material (55 exhibits spanning more than 500 pages) to dispute the Complaint's allegations and inferences, especially when they could have properly made such a challenge through a factual attack supported by competent evidence. *See* Pls.' Opp. 24–25. It is likely because any factual attack would have been futile without affording Plaintiffs the opportunity to take discovery, especially because here standing and the merits overlap. *Id.*

false and ignores Plaintiffs' factual allegations. SGAs are "not pre-funded like the PBGC"; they are instead "funded by *after-the-fact* assessments" of their members after an insurer's collapse. Compl. ¶ 34 (emphasis added). SGAs are thus irrelevant to Article III. A plaintiff's standing is not defeated because (i) a *third party* (ii) *may* offer her some compensation (iii) *after* the defendant causes her harm. Pls.' Opp. 37 n.6.[14] Defendants ignore Plaintiffs' factual allegations about SGAs and do not even to attempt to explain how a hoped-for, post-injury remedy from a third party could bear on Article III standing. *Id.*[15]

***Third***, Defendants assert that Athene's reinsurance is a separate "layer[]" of protection, but say virtually nothing else about it. Resp. 20. For good reason. Plaintiffs allege Athene's reinsurance *increases* its risk because Athene reinsures via its own Bermuda-based captive subsidiaries, which are in essence "itself," Compl. ¶¶ 53, 72; such offshore affiliated reinsurance does not protect policyholders, *id.* ¶ 69; safe insurers like New York Life "maintain[] *zero* affiliated reinsurance" while Athene's exceeds "5,000% of its surplus," *id.* ¶ 69; Athene's reinsurance practices resemble those that contributed to numerous other insurers' failure, *id.* ¶¶ 41, 79–88; much of Athene's affiliated offshore reinsurance is so-called "Modified Co-Insurance," particularly risky because it allows Athene to evade capital requirements, distort risk measurements, and maintain less surplus, *id.* ¶¶ 70–71; and such practices are a "[d]riving factor[]

[14] To illustrate, a crime victim does not lack standing to sue her assailant because she might receive some relief from a compensation fund; a client defrauded by her attorney does not lack standing to assert malpractice claims because she may seek some relief from the Pennsylvania Lawyers Fund for Client Security; and a homeowner does not lack standing to sue an arsonist who torched her home because her homeowner's policy might provide coverage. *See, e.g.*, *Liberty Mut. Fire Ins. Co. v. Michael Baker Int'l. Inc.*, No. 2:19-cv-00881-JNP-DAO, 2022 WL 1568923, at *9 (D. Utah May 18, 2022) ("[T]hat a third-party—here, the [secondary] insurer—stepped in to alleviate the harm resulting from the alleged breach of contract does not erase the insured's injury-in-fact.").

[15] Defendants also ignore Plaintiffs' factual allegations that SGA coverage is limited and would not afford complete relief. Compl. ¶¶ 33–34. The existence of SGAs thus could not defeat standing even if Plaintiffs were guaranteed recovery before missed payments (which they are not). *Id.*

that has been recognized to lead to insolvency," *id.* ¶ 86; *see id.* ¶¶ 66, 72 (Athene's dependence on its in-house, Bermuda-based reinsurers who report under Bermudian standards exposes Athene to heightened risk of failure). This Court should accept *Doherty*'s well-reasoned conclusion that allegations about Athene's "affiliated reinsurance" support the reasonable inference that retirees are "at a substantial risk of losing their benefits." 2025 WL 2774406, at *5–6.

Defendants' assertion that Plaintiffs would not "lose benefits" until Athene's reinsurance "fail[s]," Resp. 20, is yet another inference they want drawn in their favor. The Complaint nowhere alleges that Athene's Bermudian reinsurers would begin paying Plaintiffs benefits immediately upon Athene's failure. And they would not. Upon Athene's insolvency, a moratorium order would freeze payments, causing Plaintiffs immediate pocketbook loss. Defendants will have the opportunity to try to prove later, with competent evidence, that Athene's Bermuda affiliates are really a protective shield that will prevent Plaintiffs from suffering loss—but they cannot do so on a facial motion to dismiss through unsupported factual assertions in their briefing.

### B. Athene's illusory credit rating does not negate its substantial risk of default.

Defendants' defense of Athene based on its credit rating similarly ignores Plaintiffs' factual allegations and asks for inferences against Plaintiffs. Resp. 22. Defendants ask the Court to infer from Athene's Moody's rating that the risk of failure is lower than 5%. Resp. 22. But they ignore Plaintiffs' allegation, supported by the NISA Study, that Athene's *actual*, market-measured credit rating is the equivalent of "BBB-"—the "lowest rating among all reported annuity providers." Compl. ¶ 95. And Defendants neglect that, historically, credit rating agencies' failures have contributed to economic disaster—which is why the Department of Labor tells fiduciaries entering transactions like this one not to rely exclusively on credit ratings. 29 C.F.R. § 2509.95-1(c). Similarly, Defendants ignore Plaintiffs' allegation that Executive Life (whose failure drove Congress to enact Section 1132(a)(9)) engaged in highly risk practices like Athene's and also held

inflated credit ratings just before its collapse. Compl. ¶¶ 35–41; *see also Court Decisions Affecting ERISA and Executive Life Annuities: Hr'g on S.1312*¸ 1993 WL 760178 (Aug. 2, 1993) ("Nearly all of the employers who purchased Executive Life annuities did so at a time when Executive Life held the *highest* possible rating from all three of the major ratings agencies.") (emphasis added). Finally, Defendants' demand that the Court infer from Athene's credit rating that its risk of default is less than 5% is directly contrary to Plaintiffs' factual allegation that Athene's "likelihood of default" is *14–21%*. NISA Study 7.[16]

### C. Defendants' argument about Plaintiffs' overlooked allegations is unpersuasive.

Last, Defendants lob *ad hominem*, accusing Plaintiffs of acting "disingenuous[ly]" by observing that the R&R reviewed the wrong complaint. Resp. 22. But Defendants cannot dispute that the R&R in fact did not review the operative Complaint and thus did not have before it factual allegations that contributed to *Doherty*'s conclusion that Athene "put Plaintiffs at a substantial risk of losing their benefits," 2025 WL 2774406, at *6; Pls.' Objs. 21.[17]

Defendants' response to the substance of Plaintiffs' overlooked allegations is unpersuasive. They again rely on factual assertions outside the record to suggest that the four recently-failed insurers addressed in the Complaint are distinguishable from Athene. Resp. 22–23. But nowhere do they grapple with Plaintiffs' allegations that Athene: "continues to use practices that have been

[16] Defendants' abstract hypothesizing about a "company A" with a ".001% risk of default" and a "company B" with a ".002% risk of default," Resp. 21, is untethered to the Complaint. Plaintiffs allege Athene's actual, all-in "default risk" is 14–21%. NISA Study 2, 7. It is simply false for Defendants to suggest (Resp. 21) that Plaintiffs "never allege that Athene is substantially likely to fail." Plaintiffs do just that. Compl. ¶¶ 4, 78; NISA Study 5.

[17] Defendants charge *Doherty* with abandoning precedent by "credit[ing] a mere increased risk of future injury as sufficient on its own to satisfy Article III." Resp. 23 n. 16. Wrong. 2025 WL 2774406, at *5 n.6 ("The Court need not determine whether a mere increase in risk of harm suffices to confer standing because Plaintiffs have plausibly alleged that Athene is at substantial risk of default."); *id.* at *3, 5–6 (explaining that plaintiffs alleged a *substantial risk Athene will default*).

historically recognized by industry professionals to place an insurer at a substantial likelihood of default," Compl. ¶ 78; employs similar practices (alleged in detail) that led to Columbian Life's insolvency, *id.* ¶ 80; engages in the "same risky practice of using an excessive amount of affiliated reinsurance relative to its surplus" that required regulators to seize insurers PHL Variable and 777 Re, *id.* ¶¶ 82–84; and has a surplus-to-liability ratio (the key measure of whether an insurer will pay policyholders) ranked 689th of 695 insurers (bottom 1%) that is far worse than safe insurers and similar to recently failed insurers, *id.* ¶¶ 55–59, 87–88.[18]

**V. Even without all these additional Article III injuries, Plaintiffs would have standing to seek disgorgement.**

Plaintiffs satisfy the three-part test set forth in *Edmonson v. Lincoln Nat'l. Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013), for deciding when a plaintiff may sue for disgorgement under ERISA regardless of whether they have suffered "financial loss." Pls.' Objs. 18. Defendants do not explain how the R&R's reason for rejecting this argument—"that Plaintiffs have no entitlement to any profits that ATI may have received as a result of the [Athene] transaction," R&R 11—could be correct given that ERISA empowers Plaintiffs *as individuals* to "obtain appropriate relief," including disgorgement. *See* Pls.' Objs. 23 (quoting 29 U.S.C. § 1132(a)(9)); Pls.' Opp. 49 (Section 1132(a)(9) has the "broadest remedial sweep" of any provision in Section 1132).

Instead, Defendants say *Edmonson* is inapplicable because it involved "*life-insurance.*" Resp. 24. But nothing in *Edmonson* suggests the court's Article III analysis distinguished between life-insurance and retirement benefits; such a distinction is irrelevant to Article III; and *Edmonson* was plainly not so limited. 725 F.3d at 418 ("To summarize, an ERISA beneficiary suffers an

[18] Defendants' argument (Resp. 23) that Plaintiffs do not allege these recently failed insurers have "failed to pay annuitants or other policy holders" falls flat. PHL Variable, for example, is currently enjoined from making payments to policyholders. Moratorium Order, Dkt. 101.86, *Mais v. PHL Variable Ins. Co.*, No. UWY-CV24-6085274-S (Conn. Sup. Ct. June 25, 2024).

injury-in-fact sufficient to bring a disgorgement claim when a defendant allegedly breaches its fiduciary duty, profits from the breach, and the beneficiary, as opposed to the plan, has an individual right to the profit."); *see Peters v. Aetna*, 2 F.4th 199, 219 (4th Cir. 2021) (holding *outside* the life-insurance context that the plaintiff had Article III standing to seek disgorgement absent financial injury); *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 365–66 (4th Cir. 2015) (following *Edmonson* and holding the same in a *pension* case). And contrary to Defendants' argument, *Perelman* does not undermine, but supports, Plaintiffs. That case reaffirmed use of *Edmonson*'s three-part test in the *pension* context, and the plaintiff lacked standing only because he failed to show "an individual right to the defendant's profit," *Perelman*, 793 F.3d at 375 (quoting *Edmonson*, 725 F.3d at 417). That is not true here. Pls.' Objs. 23.

Defendants' only other argument is that *Thole* "abrogated" both *Edmonson* and *Perelman*. Resp. 20. But again they misread *Thole*. The trust-based standing theory failed there because the plaintiffs lacked any interest in the plan assets (as they remained plan participants) and thus had "no entitlement," Resp. 24, to profits derived from the misuse of those assets. *Thole*, 590 U.S. at 542–43. *Thole*'s rejection of standing was thus consistent with *Edmonson/Perelman*, because the *Thole* plaintiffs lacked an "individual right to the defendant's profit." *Perelman*, 793 F.3d at 375.

In sum, *TransUnion* recognized (after *Thole*) that Plaintiffs may sue for harms actionable at common law. 594 U.S. at 425. And at common law an individual suffered actionable injury when a fiduciary violated her legal rights by misusing trust assets to enrich itself.[19] That describes

[19] *See, e.g.*, *Michoud v. Girod*, 45 U.S. 503, 556–57 (1846) (embracing this ancient rule recognized in *Davoue v. Fanning*, 2 Johns. Ch. 252 (N.Y. Ch. 1816)); *Davoue*, 2 Johns. Ch. at 256–61 (plaintiff could sue his trustee for a conflicted transaction "without showing actual injury," even where there was no proof the sale was "undervalue[d]" or "not *bona fide* and regular"); *Restatement (Third) of Agency* § 8.01 cmt. d(1)–(2) (2006) (principal may sue agent for its breach of fiduciary duty, "even though the principal cannot establish that the agent's breached caused loss," and agent must "account to the principal for the benefit" realized "through the breach").

Plaintiffs. No case has rejected this logic; *Thole* rejected the trust-based standing theory there only because the case's unusual facts (plaintiffs unaffected by the lost assets caused by the breach) meant they were "not similarly situated to the beneficiaries of a private trust." 590 U.S. at 542.

**VI. This Court should not follow either *Camire* or *Bueno*.**

Defendants rely heavily on *Camire v. Alcoa USA Corp.*, No. 24-1062 (LLA), 2025 WL 947526 (D.D.C. Mar. 28, 2025), and *Bueno v. Gen. Elect. Co.*, No. 1:24-cv-0822 (GTS/DJS), 2025 WL 2719995 (N.D.N.Y. Sept. 24, 2025), both of which remain pending at the district-court level because the plaintiffs have sought to replead with new, substantial factual allegations. With respect to those courts, their standing opinions suffer from substantial flaws and their reasoning has been persuasively rejected by the opinions in *Doherty*, *Piercy*, and *Konya*.

For example, *Camire*'s brief analysis misapplied *Thole* and *TransUnion*; did not acknowledge the wealth of precedent holding that a loss of value is economic harm that satisfies Article III; did not explain why the plaintiffs' loss of legal protections was not a separate Article III injury; and placed weight on the existence of SGAs, without justifying how that potential, post-injury remedy from a third party could bear on the Article III analysis.

**CONCLUSION**

Defendants' Rule 12(b)(1) motions must be denied.

Dated: December 10, 2025

Respectfully submitted,

/s/ *Jerome J. Schlichter*
SCHLICHTER BOGARD LLC
Jerome J. Schlichter (MO 32225)*
Sean E. Soyars (MO 57317)*
Kurt C. Struckhoff (MO 61873)*
Patrick R. Kutz (MO 66023)*
100 South Fourth Street, Suite 1200
Saint Louis, Missouri 63102
(314) 621-6115, (314) 621-7151 (fax)
jschlichter@uselaws.com

/s/ *John A. Schwab*
JOHN A. SCHWAB, ATTORNEY AT LAW, LLC
John A. Schwab (PA 89596)
436 Seventh Avenue, Suite 300
Pittsburgh, Pennsylvania 15219
(412) 235-9150
jas@johnschwablaw.com

/s/ *Cyril V. Smith*
ZUCKERMAN SPAEDER LLP

ssoyars@uselaws.com
kstruckhoff@uselaws.com
pkutz@uselaws.com

*admitted *pro hac vice*

*Interim Lead Class Counsel for the Proposed Class*

/s/ *Edwin J. Kilpela, Jr.*
WADE KILPELA SLADE LLP
Edwin J. Kilpela, Jr. (PA 201595)
Paige T. Noah (PA 327552)
6425 Living Place, Suite 200
Pittsburgh, Pennsylvania 15206
(412) 314-0515
ek@waykayslay.com
pnoah@waykayslay.com

Cyril V. Smith (MD 9012190277)*
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
(410) 949-1145, (410) 659-0436 (fax)
csmith@zuckerman.com

/s/ *Bryan M. Reines*
Bryan M. Reines (CA 336269)*
2100 L Street N.W., Suite 400
Washington, D.C. 20037
(202) 778-1846, (202) 822-8106 (fax)
breines@zuckerman.com

/s/ *Edward Stone*
EDWARD STONE LAW, P.C.
Edward Stone (NY 2259489)*
175 West Putnam Avenue, Second Floor
Greenwich, Connecticut 06830
(203) 504-8425, (203) 348-8477 (fax)
eddie@edwardstonelaw.com

/s/ *Elizabeth Hopkins*
HOPKINS ERISA LAW
Elizabeth Hopkins (CA 324431)*
12123 Laurel Terrace Drive
Studio City, CA 91604
(301) 938-7516
hopkinserisalaw@outlook.com

/s/ *Douglas S. Brooks*
LIBBY HOOPES BROOKS & MULVEY, P.C.
Douglas S. Brooks (MA 636697)
260 Franklin Street
Boston, Massachusetts 02110
(617) 338-9300, (617) 338-9911 (fax)
dbrooks@lhbmlegal.com

*admitted *pro hac vice*

*Interim Co-Counsel for the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2025, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to counsel of record.

/s/ *John A. Schwab*
John A. Schwab